IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA,                                    PLAINTIFF,

v.                                    CIVIL CASE NO. 3:16cv27 TSL-RHW

REAL PROPERTY LOCATED AT
19 CRANE PARK, HATTIESBURG,
LAMAR COUNTY, MISSISSIPPI
IMPROVEMENTS, AND FIXTURES                              DEFENDANT
THEREON, *ET AL*.                                        PROPERTY.

## FIRST AMENDED COMPLAINT

The United States of America, the Plaintiff herein, by and through its undersigned

counsel, brings this First Amended Complaint for forfeiture *in rem* ("Amended Complaint" or

"Complaint") and alleges as follows in accordance with Supplemental Rule G(2) of the Federal

Rules of Civil Procedure:

## NATURE OF THE ACTION

1.      This is a civil action *in rem* brought to forfeit property involved in or traceable to

one or more conspiracies by individuals and entities associated with three Mississippi

pharmacies to defraud more than $400 million from public and private health insurance

providers.  The United States seeks forfeiture of the properties listed in Attachment A hereto (the

Defendant Property) as proceeds traceable to specified unlawful activities, specifically health

care fraud, mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1347, and

conspiracies to commit such offenses, including but not limited to violation(s) of 18 U.S.C.

§ 1349 (conspiracy to commit wire fraud); and as property involved in and traceable to property

involved in a scheme to launder the proceeds thereof in violation of 18 U.S.C.

§§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 1957.

## KEY PERSONS AND ENTITIES

2.     Although a large number of individuals and entities participated in and facilitated the fraud and money laundering scheme described in this Amended Complaint, there are several specific persons and entities at its center.  Throughout this Complaint, the term "member" is used to refer to a person who owns an interest in a limited liability company ("LLC") and the term "managing member" is used to refer to an LLC member who actively participates in making management decisions, conducting business on behalf of, and running a LLC.

3.     World Health Industries, Inc., d/b/a RX Pro Pharmacy ("World Health"), was located at 1485 Livingston Lane, Jackson, Mississippi.  World Health shipped all of its prescriptions to customers via Federal Express ("FedEx"), United Parcel Service ("UPS"), and the U.S. Mail.  World Health's office was in an industrial park with no walk-up service.  World Health operated as a "hub" for multiple other pharmacies, including, but not limited to Van Dev Enterprises (d/b/a McDaniel Pharmacy in Port Gibson, MS), Vicksburg Specialty Pharmacy (Vicksburg, MS), Service RX (Ridgeland, MS), Opus Pharmacy (Jackson, MS), and Gluckstadt Pharmacy (Gluckstadt, MS).  This method of operation allowed World Health to coordinate the submission of the claims to insurance companies through its affiliate locations.  These affiliates also allowed World Health to avoid detection by the insurance programs that had barred World Health from submitting claims.

4.     Advantage Medical and Pharmacy ("Advantage Pharmacy") was a compounding pharmacy located at 6375 U.S. Highway 98 West, Suites 30-50, Hattiesburg, Mississippi 39402.  Advantage Pharmacy marketed and sold compounded prescriptions throughout the United States.  Advantage Pharmacy shipped these compounded prescriptions via FedEx, UPS, and the U.S.

mail.  Advantage Pharmacy also operated an affiliate location, Advantage Medical Infusion, LLC ("AMI") a/k/a Advantage Apothecary, LLC, located at 5296 Old Highway 11, Suite 4, Hattiesburg, Mississippi 39402.  AMI produced compounded medications for Advantage Pharmacy.

5.     Medworx Compounding, LLC ("Medworx"), was a compounding pharmacy located at 950 East County Line Road, Suite A and Suite G, Ridgeland, Mississippi 39157.  Like Advantage Pharmacy, Medworx shipped its compounded medications to customers via FedEx, UPS, and the U.S. Mail.

6.     Mitchell "Chad" Barrett ("Barrett") is a resident of Clinton, Mississippi.  From approximately December 2012 until on or about March 10, 2015, Barrett was a member of World Health.  On or about March 10, 2015, World Health Industries split into two entities, World Health Industries (later AspireRx) and OpusRx, LLC.  As part of this split, Barrett left World Health Industries and became a managing member of OpusRx.

7.     Wade Walters ("Walters") is a resident of Hattiesburg, Mississippi.  Walters founded and was a member of Prime Care Marketing, LLC ("Prime Care Marketing").  Walters was also one of the members of Total Care Marketing, LLC ("Total Care Marketing"), the exclusive marketer for Advantage Pharmacy.  Walters became a member of Advantage Pharmacy in or about January 2013.  Walters also controlled the ownership interest of his wife, Dorothy Walters, in Medworx.

8.     Hope Thomley is a resident of Hattiesburg, Mississippi.  Hope Thomley was a member, along with Walters, of Prime Care Marketing.  Hope Thomley was also a member of Total Care Marketing, along with Walters.

3

9.     Thomas E. "Tommy" Spell, Jr. ("Spell"), is a resident of Ridgeland, Mississippi. Spell is a pharmacist licensed by the state of Mississippi.  Beginning in or about July 2014, Spell became a managing member of Medworx.

## OVERVIEW OF THE SCHEME

10.     Beginning in 2012, World Health, Advantage Pharmacy, and related pharmacies, and in 2014, Medworx and related pharmacies, (collectively "the pharmacies"), by and through their agents and representatives, conspired to commit health care fraud, mail fraud, and wire fraud associated with the marketing and sale of compounded medications.  Compounded medications are specialized medicines designed to meet unique needs of patients and because of their complexity, yield a high profit margin for the pharmacies that provide them.  Using fraudulent billing practices related to compounded medications and illegal kickbacks paid to marketers, the pharmacies engaged in a widespread scheme to defraud the Defense Health Agency (hereinafter "TRICARE") and other federal health care programs, including Medicare and Medicaid, as well as private insurance companies.

11.     To maximize profits from the fraud scheme, the pharmacies created their own demand for compounded medications.  The pharmacies illegally engaged a series of marketers to provide incentives to doctors to write prescriptions for compounded medications and divert patients to the pharmacies.  The pharmacies also used the marketers to identify complicit doctors willing to write prescriptions for compounded medications for patients whom they never saw and where there was no determination of medical need.  The marketers also recruited health care plan beneficiaries ("beneficiaries") who agreed to allow compounding pharmacies to submit claims on their behalf for compounded medications.  The pharmacies used the marketers to execute an

illegal kickback scheme to compensate the participating doctors and beneficiaries for assisting the pharmacy in committing the fraud. The marketers were also compensated for their part in locating the beneficiaries and corrupt doctors. To conceal the kickback scheme and fraudulent billing for compounded medications, the pharmacies also engaged in other fraudulent billing practices, such as automatically refilling prescriptions despite patient requests to stop and structuring billing for prescriptions in smaller amounts multiples times to avoid price caps built into the insurer's claims adjudication system.

12.     The concept of using the fraudulent billing practices and marketers to support an illegal kickback scheme to enhance profits began at World Health with Barrett and the other principals there. World Health engaged, among others, Prime Care Marketing, which was owned and operated by Walters and Hope Thomley, to recruit doctors and beneficiaries so World Health could bill government and private insurers for compounded prescriptions. For their part in executing the fraud scheme, Walters and Hope Thomley, through Prime Care Marketing, were paid a kickback for each compounded prescription they referred to World Health.

13.     Eager to increase their control over the process and the profitability of the scheme, Walters and Hope Thomley acquired an interest in Advantage Pharmacy, a pharmacy already operating in the Southern District of Mississippi. Walters and Hope Thomley maintained their positions at Prime Care Marketing, but also formed Total Care Marketing. Total Care Marketing was the exclusive marketer for Advantage Pharmacy and earned approximately 50% of the amount reimbursed every compounded prescription that was adjudicated.

14.     Eventually, in or about April 2014, Walters, in an effort to to expand the fraud scheme to more states and utilize more aggressive marketers, began shifting his focus from

Advantage Pharmacy to Medworx. Walters acquired an interest in Medworx and partnered with Spell to perpetuate a virtually identical scheme.

15.     As a result of rampant fraud, the pharmacies collected more than $400 million in illicit proceeds from TRICARE, Medicare and other federal health care programs, and various private insurance companies. The proceeds were then divided among the individuals involved in the scheme, who often used LLCs and trusts to launder proceeds and purchase the defendants *in rem*.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture pursuant to 28 U.S.C. § 1355(a).

17.     This Court has *in rem* jurisdiction over the Defendant Property pursuant to 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395.

18.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395 because acts and omissions giving rise to the forfeitures occurred in this district.

## THE DEFENDANTS *IN REM*

19.     The defendants *in rem* consist of real and personal property described with more particularity in Attachment A to this Complaint. The personal property assets are all presently in the custody of the United States, with the exception of Asset B-029, and the location where each asset was seized is indicated in Attachment A by judicial district (*e.g.*, S.D. MS indicates the asset was seized in the Southern District of Mississippi). Each defendant is assigned an asset identifier. All assets that were seized from accounts held by a financial institution are listed as

"A-###."  All other personal property assets are listed as "B-###."  All real property assets are listed as "C-###."

20.      All of the defendant personal property assets listed and described in Attachment A are presently in the United States' custody pursuant to search and seizure warrants that federal agents executed on or about January 21, 2016, January, 28, 2016, March 10, 2016, and May 17, 2016, with the exception of Asset B-029.  Accordingly, the Plaintiff requests that the Clerk of Court issue Arrest Warrants *In Rem* for each personal property listed therein pursuant to Supplemental Rule G(3)(b)(i) and, for Asset B-029, Plaintiff will seek an Arrest Warrant *In Rem* from the United States District Court for the Southern District of Mississippi.

21.      Additionally, the Defendant Property includes 54 real properties (the Defendant Real Properties), all of which are within the jurisdiction of the Court.  Pursuant to 18 U.S.C. §§ 985(b)(1) and (c)(1), the United States will file a Notice of *Lis Pendens* in county records where each Defendant Real Property is located to the extent a *lis pendens* has not already been filed.

## FACTS SUPPORTING FORFEITURE

### I.   THE INDUSTRY BACKDROP

#### A.  Processing of Health Care Claims

22.      According to the United States Centers for Medicare and Medicaid Services, in 2015, United States consumers spent approximately $320 billion on prescription drugs. Although out-of-pocket consumer and general assistance payments accounted for approximately 14 percent of that total, the overwhelming majority of the remaining approximately $275.5 billion in costs were paid by private health insurance providers, federal government health insurance plans, such as the TRICARE, Medicare, Medicaid, and the Children's Health

Insurance Program, Workers Compensation, and other state and local government health insurance funds.

23.     To ensure the efficient and cost-effective delivery of medicines to patients, sophisticated coordination is needed between the pharmacies, who dispense medications, and private insurers and government entities, who pay most of those costs.  To address this need, these entities have developed a complex, automated process for submitting, assessing validity, and communicating decisions on claims that pharmacies submit on behalf of beneficiaries.  As described in more detail below, that process, commonly known as the claims adjudication process, relies on writings, signs, and signals transmitted via wire and other means, often from one state to another, using the instrumentalities of interstate commerce.

24.     In the interest of efficient administration, the claims adjudication process ordinarily relies on a threshold presumption that claims submitted electronically by pharmacies on behalf of an insured are truthful and valid.  An insurer or other health benefit plan administrator then uses a fully automated system to examine each claim, determine whether it falls within the scope of allowable benefits and coverage, and render a decision within a matter of minutes.

25.     To guard against gross fraud, most health benefit plans' review protocols include a series of automated safeguards called "plan edits," which are designed to trigger additional, more probing reviews for claims that meet specified criteria prior to authorizing payment.  Those criteria can include various triggers, including maximum payout thresholds.

### B.  Legitimate Compounding Pharmacy Operations

26.      While the vast majority of prescriptions for medication are filled at pharmacies
stocked with mass-produced, commercially available drugs that come in a range of standard
doses, some patients have specialized needs that render mass-produced options inappropriate.
For instance, patients who cannot swallow pills, patients who have allergies to common
ingredients found in mass-produced drugs, and patients for whom mass-produced dosage units
are inappropriate or ineffective all have legitimate needs for pharmaceutical products that mass-
produced drugs cannot meet.

27.      For such individuals, doctors can prescribe compounded medications to address
specific needs.  Compounded medications are provided by compounding pharmacies where
licensed pharmacists follow doctors' prescriptions to prepare unique medications specially
tailored to an individual's needs, both by combining more than one pharmaceutical component
and omitting other components.  Given that each drug is individually made, compounded
pharmaceuticals can be significantly more costly than mass-produced pharmaceuticals and, as a
result, can yield higher profits for the pharmacies.

### C.  Effects of Changes in Industry Standards

28.      Although compounded prescription sales comprised only a sliver of the
pharmaceutical market prior to 2012, a change in the standards that insurers and other health
benefit programs used to calculate allowable reimbursements between 2012 and 2015 caused
costs attributable to such claims to skyrocket.  Whereas prior to 2012, insurers calculated the
maximum allowable reimbursement for compounded prescriptions based upon that medication's
highest priced component, the "new" market standard calculated maximum allowable

9

reimbursements based upon the number of different qualifying components used in a single compounded prescription.

29.     Although the purpose for implementing the new standard was to improve transparency for patients and insurers about the precise contents of compounded medications, that standard significantly increased health care benefit program costs attributable to compounded prescriptions:

a.   For example, whereas TRICARE's 2004 compounded prescription claims totaled $5 million, by 2014, that number had increased to $514 million, a number that ultimately spiked to over $1 billion during the first four months of 2015.

b.   Between October 1, 2012, and March 31, 2016, TRICARE received a total of $2,453,290,587 in claims for compounded prescriptions, a number that, after approximately $805,694,056 in reversals, brought TRICARE's total compounded prescription expenditures to $1,647,596,531 during the period.

c.   While the total number of TRICARE beneficiaries during this same period was approximately 9.5 million, compounded medication claims submitted on behalf of only 40,000 beneficiaries accounted for approximately 20 percent of the total prescription drug costs that TRICARE paid.

30.     The exponential rise in costs attributable to compounded pharmaceutical claims prompted a closer look by private and public health insurance industry officials.  That closer look revealed a business culture riddled with systematic, institutionalized wire, mail, and health care fraud that, in only three short years, left health care access at risk for some of this country's most vulnerable populations, including veterans, the disabled, and the elderly.

II.   **THE FRAUDS**

A.  **Participants in the Frauds**

31.     Barrett, Walters, Hope Thomley, and Spell were the central architects of one of the comprehensive health care fraud, kickback, and money laundering schemes that threatened the very solvency of some health care benefit programs and operated between January 2012 and December of 2015.  Others also participated in and benefitted from the frauds.

32.     The business and personal relationships between participants in the fraud and money laundering conspiracies are organized below by pharmacy.  Many of the relationships overlap, and individuals often played more than one role in a particular scheme.  As a result, the descriptions below are not comprehensive, but provide a general overview of the various players' roles in the frauds.

a.  **The "World Health Network"**

33.     World Health was a compounding pharmacy based in the Southern District of Mississippi that did business in multiple states.  Between December 2012 and approximately March 10, 2015, Barrett, David Jason Rutland ("Rutland"), James Benett ("Benett"), Nicole Hotard ("Hotard"), Christopher Merriweather ("Merriweather"), Robert Durham ("Durham"), and Cynthia Rocray ("Rocray"), were members of World Health.  World Health also did business as RX Pro.  Rutland, a Mississippi licensed pharmacist, worked as the pharmacist-in-charge.  At various times relevant to this Complaint, Barrett, Rutland, Hotard, Durham, Rocray, and Merriweather had signatory authority over the accounts into which proceeds of World Health's frauds were deposited.

11

34.     On or about March 10, 2015, Barrett formally divested himself of his World Health membership and formed Opus RX, where he became the manager.

35.     Rutland, Benett, Hotard, Merriweather, Durham, and Rocray, however, remained World Health members, and Rutland continued to work as World Health's pharmacist-in-charge. On or about June 2, 2015, World Health changed its name to Aspire RX.

36.     Thomas Shoemaker ("Shoemaker"), Barrett's cousin and assistant, colluded with World Health and others by receiving compounded prescriptions on his own behalf and on behalf of three additional immediate family members in exchange for kickbacks. Shoemaker was just one of many individuals who received prescriptions from World Health in exchange for kickbacks.

37.     Throughout their operations, World Health, RX Pro, Opus RX, and Aspire RX employed marketers that recruited corrupt doctors willing to write fraudulent prescriptions for compounded medications and locate people entitled to government health benefit and insurance reimbursement for these medications. The primary marketer was Prime Care Marketing, which Walters formed in Mississippi on or about September 14, 2012. By its dissolution on April 4, 2015, Hope Thomley was also a Prime Care Marketing member. Prime Care Marketing was located in Mississippi, but contracted with sub-marketers throughout the United States.

38.     World Health also entered into a series of contracts structured to pay illegal kickbacks to marketers and physicians who directed compounded prescriptions to World Health. World Health created business entities to facilitate these kickbacks. Many of these entities were given names that started with the letters "BAMBR," followed by letters denoting the state where

the entity was created.  For instance, BAMBRWV, LLC was the entity created in West Virginia to pay kickbacks.

>  **b.  The "Advantage Pharmacy Network"**

39.     Established in 2008, Advantage Pharmacy originally operated as a traditional pharmacy and durable medical equipment supplier.  In mid-to-late 2012, Glenn Doyle Beach ("Beach"), Todd Nace ("Nace"), Jason May ("May"), and Joele Smith ("J. Smith"), were members of Advantage Pharmacy.  Walters and Hope Thomley became involved with Advantage Pharmacy, eventually becoming members, and transitioned Advantage Pharmacy into a compounded medication pharmacy.

40.      May was a licensed Mississippi pharmacist who served as Advantage Pharmacy's pharmacist-in-charge from December 2011, until at least January 2016, and later became an Advantage Pharmacy member.

41.     At various points relevant to this Amended Complaint, Beach, Nace, and possibly others had signatory authority over bank accounts into which Advantage Pharmacy's fraud proceeds were deposited.

42.     United Business Ventures, LLC, was formed on or about March 21, 2011, by Hope Thomley and Randy Thomley and was later used as a mechanism for Advantage Pharmacy to pay recipients of compounded medications for their participation in the scheme to defraud.

43.     Advantage Pharmacy also used marketers to recruit corrupt doctors to write fraudulent prescriptions and pay beneficiaries receiving compounded medications.  One of those marketers was Total Care Marketing, which was formed on or about September 12, 2012, with members Hope Thomley and Walters.  Walters owned an approximately 40 percent interest.

13

Total Care Marketing served as the exclusive marketer for Advantage Pharmacy, receiving kickbacks of approximately 50% of all funds paid to Advantage Pharmacy by health insurance providers for compounded medications.

44.     On or about February 14, 2013, members Randy Thomley and C. Smith formed Advantage Marketing.  Advantage Marketing was a marketer for Advantage Pharmacy, working under Total Care Marketing.  Although Total Care Marketing and Advantage Marketing are both Mississippi companies, Advantage Pharmacy used other marketers located throughout the United States.

45.     On or about March 30, 2013, Garrett Braley ("Braley"), Hope Thomley's son, formed Solas Marketing, LLC ("Solas Marketing"), a marketing entity which did business with Advantage Pharmacy through Total Care Marketing and which was dissolved on or about December 20, 2014.

      **c.   The "Medworx Network"**

46.     In or 2012, Rhett Crowder ("Crowder") and Robin Morris ("Morris"), as well as Kevin Kellum ("Kellum") and Gregory Brett ("Brett") in their capacities as members of the business entity GB2K, LLC, and John Thomas ("Thomas") and Daron Walters ("D. Walters") in their capacities as members of the business entity J-P MedSupplies, LLC, established Medworx, which functioned as a traditional pharmacy.  In or about July 2014, Walters had a falling out with other Advantage Pharmacy members.  Dorothy Walters, believed to be acting on behalf of or in concert with Walters, her husband, joined Crowder, Morris, GB2K and J-P MedSupplies, as a Medworx member.

14

47.     After Dorothy Walters purchased her Medworx membership, Walters recruited Spell, a licensed Mississippi pharmacist who ultimately joined Medworx as a managing member and ran Medworx's day-to-day operations.

48.     On or about September 27, 2013, Spell, in turn, created Salus Consulting, LLC, an LLC of which he was a member and served as the registered agent, with a business address identical to the one for Medworx.

49.     Likewise, between March 18, 2015, and at least January 21, 2016, Robbie Young ("Young") worked as the Medworx accountant.  At various points relevant to this Complaint, Walters, Spell, and at least two other individuals had signature authority over bank accounts into which proceeds of Medworx's fraud were deposited.

**B.  The Fraud Victims**

50.     The government-funded health care programs defrauded as a result of the crimes described herein include, but are not limited to:

a.   The Defense Health Agency, an agency within the U.S. Department of Defense that provides insurance to current and former U.S. military personnel and their dependents, more commonly known as the Tricare Health Plan or TRICARE;

b.   The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), a comprehensive health care program in which the Veteran's Administration shares costs of covered health care services and supplies with eligible beneficiaries;

15

c.  Medicare, a federally-funded system of health insurance for people over 65 and
people with disabilities administered by the Centers for Medicare and Medicaid
Services, an agency of the U.S. Department of Health and Human Services;

d.  Medicaid, a federally-funded program for health insurance coverage to low-
income people and one of the largest payers for health care in the United States, is
administered by the Center for Medicaid and CHIP Services, one of six Centers
within the Centers for Medicare and Medicaid Services;

Each of these programs qualifies as a federal health care program under the definition provided
by 42 U.S.C. § 1320a-7b(f).  Federal law makes it illegal to make or cause to be made any false
statement or representation with respect to any application for any benefit or payment under a
Federal health care program or to pay certain kinds of remuneration, including kickbacks, for
referrals with respect to the furnishing or arranging for the furnishing of any item or service for
which payment may be made in whole or in part under a federal health care program.  42 U.S.C.
§ 1320a-7b.

51.     Additionally, the conspirators defrauded the Office of Workers' Compensation
Programs ("OWCP") for the U.S. Postal Service, which administers four major disability
compensation programs and provides medical treatment and other benefits to certain workers
andtheir dependents who experience work-related injuries or occupational diseases.

52.     Numerous private insurers, such as Blue Cross Blue Shield, who paid claims
through pharmacy benefit managers (PBMs), also suffered large losses as a result of the fraud
scheme.  A PBM is an intermediary entity that receives claims from pharmacies, submits them to
health benefit plans for payment, and then receives the reimbursement payments and transmits

these payments electronically to the appropriate pharmacy's account.  PBMs are used for submitting claims to private insurers and to government-funded programs such as Medicare and Medicaid.  PBMs include such companies as CVS Caremark, Express Scripts Holding Company, Prime Therapeutics LLC, and Catamaran Corporation.

C. **The Fraudulent Business Practices**

53.    Although the 2012 standards for calculating maximum allowable compounded prescription claims helped patients and insurers understand the contents of compounded medications, those standards also created incentives and opportunities for unscrupulously managed compounding pharmacies. World Health, RX Pro, OpusRX, Aspire RX, Advantage Pharmacy, and Medworx all engaged in an illegal kickback scheme to pay doctors and beneficiaries to assist them in submitting false claims for compounded prescriptions. The pharmacies also submitted false claims to government and private insurers and collected the proceeds from the insurers.  Additionally, the pharmacies engaged various other types of misconduct to support the overall fraud and maximize profits.

a. **Kickbacks and Improper Financial Incentives**

54.    Beginning no later than September 2012 and continuing until at least January 2016, compounding pharmacies, including World Health, Advantage Pharmacy, and Medworx took measures to manufacture artificial demand for their specialized products by enlisting marketers to identify corrupt doctors willing to write compounded prescriptions and health care program beneficiaries willing to allow pharmacies to submit claims for compounded medications on their behalf, oftentimes regardless of medical necessity.

17

55.     To motivate marketers to find doctors and beneficiaries, World Health, Advantage Pharmacy, and Medworx entered into agreements to unlawfully remit kickbacks from claims paid by federal health care programs such as TRICARE.  In many cases, those marketers then remitted portions of the unlawful payments that they received to prescribing physicians, and in some cases, to those health care plan beneficiaries who received the compounded prescriptions.

The World Health Network

56.     Business records reveal that World Health not only promised kickbacks to marketers, but that it also paid them.  For example, between November 2012 and May 2013, World Health paid a total of $6,870,701.37 to Walters and Hope Thomley's Prime Care Marketing, and between January 2014 and September 2014, World Health paid a total of $1,134,883.42 to Hope Thomley's Connecting Markets.

57.     In addition to various marketing agreements, World Health also structured contracts to pay kickbacks to marketers and physicians who directed compounded prescriptions to World Health through the BAMBR entities.   For example, on August 27, 2013, World Health, through its affiliate WHIG, LLC, entered into a contract with Person A to act as a marketer for World Health.  The contract provided that Person A would be responsible for "acquiring satisfactory business of prescriptions from physicians" and that Person A would receive a percentage commission for any prescriptions referred to World Health for transdermal pain creams.  Person A would earn between 30% and 35% of the sales, depending on the total sales he brought to World Health.  Person A and World Health then formed a limited liability company called BAMBRWV, LLC to share the profits of their venture.

18

58.     Moreover, World Health paid kickbacks to beneficiaries on whose behalf it submitted compounded prescription claims.  For instance, between August 22, 2013, and April 27, 2015, Shoemaker, a TRICARE beneficiary, enrolled three additional family members in that plan, and World Health began filling the same compounded prescription that Shoemaker was receiving for those family members as well.  Ultimately, between August 22, 2013, and April 27, 2015, World Health not only submitted a total of $362,000 in compounded prescription claims to TRICARE on behalf of Shoemaker and his family members, but also paid Shoemaker at least $20,000 for his role in the scheme.  World Health also purchased two vehicles in Shoemaker's name, defendant Assets B-007 and B-008.

<u>The Advantage Pharmacy Network</u>

59.     Advantage Pharmacy paid kickbacks to marketers for the compounded medication prescriptions that it submitted to TRICARE and other federal health care programs.  Total Care Marketing, which was owned by Advantage Pharmacy members Hope Thomley and Walters, had a marketing contract that ensured it was paid approximately 50% for every compounded prescription it brought to Advantage Pharmacy.  Total Care Marketing would then engage and pay sub-marketers to get prescriptions for Advantage Pharmacy to fill.  An illustration of how this scheme worked can be seen in connection with compounded prescriptions provided to relatives of Randy Thomley, who were TRICARE beneficiaries (more details regarding these prescriptions are discussed below in paragraph 67).  In total, three different health care providers wrote prescriptions for Randy Thomley's relatives: an oral surgeon, a nurse practitioner, and an OB/GYN.  Pharmacy records indicate Prime Care Marketing was the marketer paid for the prescriptions written by the oral surgeon for these patients.  Like Total

19

Care Marketing, Prime Care Marketing is owned by Advantage Pharmacy members Walters and Hope Thomley. Joel Walters, Walters' brother, was the marketer paid for the prescriptions written by the nurse practitioner, who is a friend of Joel Walters. Finally, APGC, LLC, a sub-marketer under Randy Thomley's Advantage Marketing, was paid for the prescriptions written by the OB/GYN.

60.     Advantage Pharmacy also used marketers to pay kickbacks to health care plan beneficiaries. With regard to the prescriptions for Randy Thomley's relatives, for example, Advantage Pharmacy paid the relatives by routing money through United Business Ventures, a business entity of which Hope and Randy Thomley were members, and Thomley Christmas Tree Farm, LLC, a business that Randy Thomley inherited from his father.

The Medworx Network

61.     Medworx remitted similar kickbacks to marketers and health care plan beneficiaries. According to business records obtained from Medworx, Young, an accountant for Medworx, sent an email to Jonathan McFadden ("McFadden"), Walters' personal accountant, which attached a file containing the billing information for Medworx from August 29, 2014, to January 31, 2015. This information indicated that during this period Medworx billed more than $21 million to TRICARE that was associated with various marketing companies, while only slightly more than $329,000 was billed without being associated with a marketer.

62.     Medworx's payments also extended to beneficiaries. For instance, between December 2014 and April 2015, Medworx paid a total of $600,000 to a California marketer with whom it had a business relationship. Included within this amount were kickbacks for prescriptions submitted to TRICARE filled in the marketer's name.

63.     The marketers receiving kickbacks were key to the scheme, essentially creating markets for drugs that only a relatively small portion of individuals need.  The pivotal role played by marketers can be seen in the example of how Walters turned Medworx into a compounding pharmacy almost overnight.

64.     In or about July 2014, Dorothy Walters acquired an interest in Medworx while Walters was still a member of Advantage Pharmacy.  Prior to diverting his attention from Advantage Pharmacy to Medworx, Walters arranged for several out-of-state marketers to transfer their relationships from Advantage Pharmacy to Medworx.  As a result, when Walters started operating Dorothy Walters' compounding pharmacy business with Spell at Medworx, he had a network of marketers already in place.

65.     The effectiveness of the marketers in finding beneficiaries entitled to reimbursement for compounded prescriptions can be seen in the growth of Medworx's income from these prescriptions.  Prior to Walters' and Spell's involvement, Medworx was not substantially involved in the compounding business.  In the first quarter of 2014, for example, TRICARE paid it just $5,896.24 related to compounded medications.  However, in the 2nd quarter of 2014, immediately after Walters and Spell joined Medworx, the amount of money paid for compounded prescriptions by TRICARE increased to $149,954.66, and for the third quarter it was more than ten times that amount, $1,524,521.49.  This exponential growth continued and in the first quarter of 2015, less than a year after Walters and Spell took over Medworx, TRICARE alone paid the pharmacy $64,312,169.08 for compounded medications sent to individuals throughout the United States.

### b.  **Filling Medically Unnecessary Prescriptions**

66.     The perverse financial incentives that the pharmacies created for marketers, physicians, and beneficiaries resulted in a large number of prescriptions being filled by the pharmacies and reimbursed by public and private insurance programs that were written by doctors who had never seen the patients for whom they were prescribing these supposed individually tailored drugs.  As a result, World Health, Advantage Pharmacy, Aspire RX, and Medworx routinely filled compounded prescriptions for customers for whom no physician had determined medical necessity.

The Advantage Pharmacy Network

67.     For example, in or about 2014, Randy Thomley, who managed Advantage Marketing, approached a male TRICARE beneficiary who was dating Randy Thomley's family member and asked if the beneficiary would like to receive a compounded prescription medication for back pain.  After the beneficiary responded affirmatively, Advantage Pharmacy regularly dispatched a compounded medication to that beneficiary even though the beneficiary reported that he never saw a physician to obtain a prescription.  Thereafter, the beneficiary married Randy Thomley's family member, and she also became TRICARE eligible.  Advantage Pharmacy commenced regular dispatches of compounded prescriptions to the beneficiary's wife, who also reported that she never saw a physician to obtain a prescription for the medication.  Later, when the original TRICARE beneficiary expressed concern to Randy Thomley about receiving medications without seeing a doctor, Randy Thomley advised the beneficiary not to worry because Randy Thomley claimed to have a doctor on staff who could write the prescriptions.  In fact, as noted in paragraph 59 above, three different health care providers wrote

the prescriptions filled for the couple and billed to TRICARE – an oral surgeon, a nurse practitioner, and an OB/GYN.  The original TRICARE beneficiary did not see any doctor related to Advantage Pharmacy's compounded prescriptions until January 2016, when a physician visited the beneficiary's home, not to conduct an exam but to make sure that the beneficiary's "paperwork" was in order.

68.     Over the two-year period when Randy Thomley's relatives received the compounded medications, Advantage Pharmacy submitted 65 claims to TRICARE for the husband and 44 claims to TRICARE for the wife, collecting at least $465,000 from TRICARE just for the prescriptions filled for these two members of Randy Thomley's family.  The number of prescriptions and the amount of profits generated by this couple during the course of the fraud is not unusual.  The top 20 individuals identified through TRICARE records as receiving the most compounded prescriptions from Advantage Pharmacy between the fourth quarter of 2012 and April 2015 accounted for 1,183 compounded prescriptions claimed by Advantage Pharmacy. Advantage Pharmacy billed TRICARE $6.3 million and TRICARE paid Advantage Pharmacy $5.4 million for the prescriptions associated with just these 20 beneficiaries.  Traditional medications during this same period billed to TRICARE by Advantage Pharmacy accounted for just $161,035.

The World Health Network

69.     Pharmacies within the World Health Network engaged in the same practices.  In or about October 2012, a TRICARE beneficiary reported receiving a ten-day supply of a compounded medication from World Health that she had never used or ordered.  The beneficiary followed up with her physician and learned the physician never prescribed the medication.

23

TRICARE records also show that the claims were submitted on behalf of the same beneficiary on two occasions in September 2012, even though the beneficiary never received the medications.

70.     Likewise, between April and September 2015, Aspire RX also dispatched compounded medications to customers who had not seen doctors for their prescriptions. For example, during this period, Aspire RX billed TRICARE more than $65,000 for 18 compounded prescriptions that it dispatched to one married couple when neither of them had ever seen a doctor. Aspire RX also billed TRICARE more than $102,000 for 24 compounded prescriptions that it dispatched to a second couple, neither of whom saw a physician.

### The Medworx Network

71.     Medworx engaged in this practice with a a married Texarkana, Texas couple, who were TRICARE beneficiaries. The husband reports that while he was serving in the Marine Reserves in Louisiana, a fellow Marine who was a marketer for Medworx approached him and asked for help meeting a  monthly quota. The husband agreed to help and signed up his wife and himself. Neither saw a doctor, but both began receiving the compounded medications in the mail from Medworx. In total, Medworx billed TRICARE $459,443.00 for 51 prescriptions sent to the couple between November 2014 and July 2015. The couple did not receive any consideration for their involvement in the scheme and said that they only participated as a favor to the marketer.

72.     Another man from Garland, Texas, was in the same Marine Reserves Unit in Louisiana and signed up his wife with the same marketer. The wife, who never saw a doctor, began receiving compounded medications from Medworx by mail. In total, Medworx billed

TRICARE $264,098 for 19 prescriptions sent to the wife between November 2014 and April 2015, and the marketer paid the husband $50 per prescription.

73.     World Health, Advantage Pharmacy, and Medworx repeatedly filled prescriptions for medications for patients who had never seen doctors, generating millions of dollars in illegal revenue for these businesses and the individuals who owned them.

### c.   <u>Other Acts in Furtherance of the Scheme to Defraud</u>

74.     While World Health, OpusRX, Aspire RX, Advantage Pharmacy, and Medworx all engaged in a kickback scheme and submitted fraudulent bills for compounded medications, the pharmacies also engaged in various acts of misconduct to further the overall scheme.  These acts perpetuated the kickback scheme and fraudulent billing practices and increased the illegal profits.

<u>The World Health Network</u>

75.     Opus RX engaged in a technique known as "price rolling" or "price testing," whereby compounded pharmacy employees submitted and then reversed a series of compounded prescription claims to identify the composition that generated the highest rate of reimbursement. Thereafter, the compounded prescription with the highest reimbursement rate became the compounded formula prepared, regardless of whether all of the components within it were medically necessary.

76.     One example of Opus RX price testing involved Shoemaker, a TRICARE beneficiary. TRICARE records show that between approximately July 17 and 22, 2015, Opus RX submitted and then reversed claims for the same prescription for Shoemaker, allegedly written by two different doctors, approximately twelve times without ever filling it, consistent

25

with testing alternative formulations to determine the highest reimbursement value.   TRICARE records further suggest that Aspire Rx engaged in a similar practice with Shoemaker between August 6, 2015, and May 11, 2016.

77.    By using "testers" like Shoemaker, World Health created a specific combination for compounded medications that it termed the "TRICARE formula." Instead of being specifically tailored to a patient's needs, the formula was instead designed to successfully pass through TRICARE's claims adjudication process while maximizing World Health's profits. Indeed, the formula was so successful, that another less successful compounding pharmacy offered to buy the formula from a World Health employee.

78.    "Split billing" was another technique that compounded prescription pharmacies used to manipulate the claims adjudication process.  This technique involved submitting claims for one medication that a doctor wrote for a specified period as if the doctor had written multiple prescriptions for a series of shorter periods.  For example, a pharmacy using this technique might receive a single prescription that a doctor wrote prescribing one dose of a medication per day for seven days.  The pharmacy would then fill and dispatch that prescription as written, but then transmit seven different claims on the beneficiary's behalf, each for a one-day supply of the medication.  Using this practice not only enabled compounding pharmacies to evade safeguards written into claims adjudication software that capped reimbursements for specific medications, but also allowed them to collect multiple dispensing fees undetected for a medication dispensed only once.

79.    World Health also dispatched compounded prescription refills and submitted reimbursement claims absent a customer request, and in some cases, even after the customer

asked that the shipments stop.  To prevent beneficiaries from returning such drugs, an act that triggered the pharmacy's obligation to reverse a claim for reimbursement, and to dissuade beneficiaries from cancelling automatic refills, pharmacy employees used a variety of tactics, including instructing customers to destroy medications after receipt and even offering payments.  In other cases, compounding pharmacies dispatched refills absent doctors' orders or in contravention to insurers' policies against refills.

80.     For example, on March 19, 2013, a TRICARE beneficiary reported that after receiving a compounded pain cream from World Health on November 16 and possibly on December 11, 2012, and after discovering that the medication was ineffective, her husband wrote to World Health and directed the pharmacy to stop sending refills.  When the pharmacy again dispatched the compounded cream despite the letter, the beneficiary's husband phoned World Health to complain.  According to the beneficiary or her husband, World Health's response was, in effect, that because the beneficiary's doctor ordered the medication, the pharmacy "ha[d] to send it," a tactic that the beneficiary or her husband said resulted in their accumulation of three unopened boxes of the medication in the couple's home that neither could determine how to return.  Further investigation revealed that between November 16, 2012, and March 14, 2013, World Health submitted a total of six claims totaling $15,257 on the beneficiary's behalf.

81.     When some health care benefit providers' discovered World Health's business practices, they placed restrictions or outright bans on the entity's ability to submit claims.  In response, World Health circumvented the restrictions and used other methods to conceal its involvement in submitting claims.  For instance, in the summer of 2014, after one private insurer's audit identified World Health's misconduct, that insurer barred World Health from

27

submitting future claims.  Thereafter, World Health submitted claims for compounded

pharmaceuticals that it allegedly dispatched to customers through other pharmacies, including,

but not limited to Van Dev Enterprises, d/b/a McDaniel Pharmacy in Port Gibson, Mississippi,

Vicksburg Specialty Pharmacy in Vicksburg, Mississippi, Service RX in Ridgeland, Mississippi,

Opus Pharmacy in Jackson, Mississippi, and Gluckstadt Pharmacy in Gluckstadt, Mississippi.

     The Advantage Pharmacy Network

     82.    Like World Health, Advantage Pharmacy also shipped medications to

beneficiaries absent customer request.  In or about October 2014, a couple who were both

TRICARE beneficiaries accepted a sales representative's offer to receive a free trial for

compounded prescriptions; neither of them ever underwent a physician's examination.

Advantage Pharmacy dispatched an initial shipment of four boxes, two for each partner, to the

couple via UPS.  When a second, unexpected shipment of four new boxes arrived with an

explanation of benefits statement disclosing the bill to TRICARE, the couple was shocked not

only at the expense, but also because they did not expect to receive a second shipment.  Although

the wife thereafter phoned Advantage Pharmacy and asked that the shipments cease, the

pharmacy continued to ship refills until the wife made a second call to Advantage Pharmacy and

returned some of the products via UPS.  Nonetheless, TRICARE records reveal that between

October 2014 and January 2015, Advantage Pharmacy filled and then refilled a total of

approximately 26 prescriptions for the couple and sought a total of $125,470.55 in

reimbursements from TRICARE.

     83.    Advantage Pharmacy also used more subtle tactics to lull beneficiaries into

acquiescing to their scheme, including paying copayments outright, waiving copayments, telling

customers they did not need to make copayments, and making little or no effort at all to collect copayments. For instance, between approximately 2014 and 2015, Advantage Pharmacy submitted 119 claims totaling $465,878.00 on behalf of one couple, both TRICARE beneficiaries, who never paid the first copayment because Randy Thomley advised them not to, saying that he was "taking care" of the cost.

84.     Advantage Pharmacy also used methods similar to those of World Health to circumvent outright bans by various health care benefit plans or otherwise conceal Advantage Medical's involvement from the health care benefit plan. Specifically, on July 10, 2015, Hope Thomley sent an email acknowledging that "We have a dispute with CVS/Caremark," saying that "we presently will not process any CVS/Caremark prescriptions," and explaining that instead, "we will send them to a partnering location for processing . . . ." Hope Thomley thereafter confirmed in a July 21, 2015, email that because of the payment dispute, CVS/Caremark prescriptions would "be filled by a sister location." Later, Braley confirmed the plan in an August 3, 2015, communication in which he wrote that "to make sure that we get paid" for CVS/Caremark prescriptions, "we sent them to Renner's [another pharmacy] to make sure they get covered." Braley elaborated on the plan on August 6, 2015, when he wrote that "another pharmacy" was "assisting us [to] fill scripts[,] [m]ainly due to our dispute with CVS CMK to ensure that those scripts get filled."

        The Medworx Network

85.     Like Advantage Pharmacy, Medworx engaged in tactics to lull beneficiaries to participate in the scheme to defraud. Medworx often paid beneficiary copayments or waived copayments. Specifically, Medworx employees purchased prepaid debit cards that were then

29

used to make beneficiary copayments.  Medworx employees also purchased money orders to make beneficiary copayments and reimbursed marketers for beneficiary copayments.

86.     Medworx also perpetuated its scheme by avoiding returns of unwanted and unused medications.  Multiple TRICARE beneficiaries reported receiving unwanted compounded medications and returning them to Medworx, but still being billed.  Other beneficiaries reported attempting to return compounded medications to Medworx, but being unable to contact any Medworx employee.

87.     When compounded medications were returned to Medworx, the medications were often relabeled and shipped to a different customer.  These medications were then rebilled to insurance.

88.     Medworx also changed the formulas of the compounded medications it was dispensing without authorization from a physician.  Medworx engaged in the practice to maximize the return from insurance and changed the formula to include whichever ingredients paid the most at the time of dispensing.  Medworx changed the formulas it used so frequently that it stopped using preprinted pads, electing to enter the prescription formula each time medication was dispensed.

## III.   The Fraud Proceeds

89.     The pharmacies were paid by submitting claims to various public and private health care benefit plans.  Upon reaching a decision as to whether to pay or decline a particular claim, the health care benefit plan electronically transmits its decision to the submitting pharmacy, which may or may not be located in the same state as the health care benefit plan's administrator.  Presuming a favorable decision, upon receiving the health care benefit plan's

30

electronic communication, the pharmacy then collects any copayment that the beneficiary owes and dispenses the prescription to a customer present on the pharmacy's premises or dispatches the prescription with a bill for any copayment due.

90.     Thereafter, at relatively regular intervals, the applicable health care benefit plan remits the portion of each prescription's cost for which it is responsible to the pharmacy, either by transmitting the funds directly to the pharmacy's bank account or indirectly by transmitting the funds to a PBM.  World Health and Advantage Pharmacy were paid using an additional intermediary step called a "co-op."  These pharmacies were members of "EPIC Pharmacies," a buying group of more than 1,400 independently owned pharmacies in the United States.  EPIC handles part of the billing process and receives funds from PBMs before they are finally transmitted to the pharmacy.

91.     The frauds described above generated hundreds of millions of dollars for the pharmacies and the individuals who owned them and the related marketers.

92.     Between July 12, 2012, and April 2015, TRICARE paid World Health $24,251,218 for compounded medications, nearly all of which were associated with a marketer illegally paid a kickback for each prescription.  Also during the same period, RX Pro billed TRICARE for $10,900,000.00 for compounding medications.  Between 2012 and 2015, one PBM paid World Health and its affiliates more than $85 million for compounded medication prescription reimbursements on behalf of private insurers and others.

93.     Overall, Advantage Pharmacy was paid at least $155,444,668.00 for compounded medications by various federal health care plans, PMBs and private insurers between June 6, 2012, and February 28, 2016.

94.     Advantage Pharmacy was paid at least $39,154,000.00 by TRICARE for compounded medications between June 6, 2012, and January 20, 2016.

95.     Advantage Pharmacy also submitted claims for compounded medications to Medicare.  Between January 1, 2010, and February 28, 2016, Medicare paid Advantage Pharmacy more than $2,428,000.00 for compounded medications.

96.     Advantage Pharmacy also submitted claims to the United States Postal Service OWCP.  Between March 5, 2013, and January 19, 2016, Advantage Pharmacy submitted 374 claims to United States Postal Service OWCP, which paid Advantage $1,205,471.93.

97.     Advantage Pharmacy also submitted claims to CHAMPVA.  Between January 3, 2013, and January 13, 2016, Advantage Pharmacy submitted 550 claims to CHAMPVA and was paid $2,017,011.15.  Between September 12, 2014, and January 12, 2016, AMI Rx, closely affiliated with Advantage Pharmacy, submitted 172 claims to CHAMPVA and was paid $807,831.84.

98.     Advantage similarly conducted the same illegal scheme with private insurers, such as Blue Cross Blue Shield of Alabama, and earned similar sums of money.  Overall, between February 2013 and December 2015, Advantage billed private insurers and was paid $109,581,673 for compounded prescriptions.  AMI Rx was paid $6,118,131 by private insurers for compounded prescriptions between June 2014 and January 2016.

99.     Medworx was paid at least $129,959,829.63 from federal health care programs, PMBs and private insurers for compounded medications.

100.    Overall, Medworx was paid approximately $87,284,947.15 by TRICARE for compounded medications between April 17, 2013, and March 15, 2016.

32

101.    Medworx also submitted claims to the United States Postal Service OWCP. Between July 16, 2013, and February 26, 2016, Medworx submitted 653 claims to USPS OWCP, which paid Medworx $1,959,965.61.

102.    Medworx also submitted claims to CHAMPVA.  Between May 10, 2013, and December 22, 2015, Medworx submitted 244 claims and was paid $2,254,916.87.

103.    Medworx conducted the same illegal scheme with private insurers and PBMs such as Catamaran, Blue Cross Blue Shield Mississippi, CareFirst/Blue Cross Blue Shield, and CVS Caremark.  Between September 2014 and December 2015, Medworx submitted claims for over $38,460,000 and was paid over $22,855,000 by these private entities.

104.    In total, the pharmacies in this case were paid more than $400 million in fraud proceeds, most of it over just two or three years.  As a result, the individuals associated with the pharmacies had enormous sums of money at their disposal and spent it on a variety of items including vacation properties, investment vehicles, luxury cars, boats, and airplanes.

105.    The financial incentives motivating the participants in the fraud are reflected in the wealth that Spell accumulated during the course of the frauds.  Spell is a pharmacist licensed in Mississippi.  Prior to joining Medworx in 2014, Spell earned less than $200,000 a year.  After managing Medworx for only 18 months, he was able to amass assets estimated to be worth more than $12 million.  During the course of the fraud and as a direct result of his role in it, he was able to purchase, among other things, a boat, a luxury car, and several pieces of real property, as well as invest in real estate development projects.

106.    Most, if not all, of the fraud proceeds were initially transferred by the various health benefit providers into the primary bank accounts for World Health, Advantage Pharmacy

and Medworx (the "Source Accounts"), and from these accounts funds were transferred through other accounts, often used in ways that appear designed to launder the funds and promote the scheme, and used to purchase various assets.

## IV.    Money Laundering and the Tracing of the Fraud Proceeds

107.    Throughout the scheme to defraud, World Health, Advantage Pharmacy, and Medworx used numerous people, business entities, trusts, shell companies, financial institutions, and accounts to transfer fraud proceeds, launder illegal funds, and promote the ongoing fraud.  In some instances, business entities were set up for what appears to be no legitimate purpose other than to conceal the nature, source, and/or ownership of the funds.  Similarly, funds were also transferred between and among multiple accounts, sometimes on the same day, for what appears to be no legitimate purpose.

108.    Each pharmacy and its owners and associates set up their own businesses and bank accounts to launder the fraud proceeds and promote the scheme.  Given the overlapping relationships between various participants in the fraud, in many instances, profits from various pharmacies were commingled as they moved through the financial system.  Although differences exist in how individuals and entities laundered their respective proceeds, the general process of how the fraud proceeds were transferred among the various bank accounts can be described as follows:

a.    A pharmacy used one or more of the Source Accounts, described above, to receive the fraud proceeds from TRICARE and other federal health care programs, and private insurers.  These proceeds were routed through PBMs and, in the case of World Health and Advantage Pharmacy, EPIC's billing system.

34

b. From the Source Account(s), the pharmacy would then transfer the funds to one or more "pass-through" accounts. These accounts were often held in the names of corporations or other business entities. The movement of funds through these pass through accounts often appears to be for the purpose of "layering" the funds as there are at times multiple transfers among several accounts with no apparent business purpose. Layering is a money laundering technique designed to complicate and confuse the source of money by creating a series of transfers of funds through a variety of accounts.

c. From the "pass-through accounts," the fraud proceeds were ultimately transferred to "recipient accounts" or into personal and real property, often held in the name of an LLC or trust. The recipient accounts received the fraud proceeds and were where the individuals involved in the fraud could access the funds for their use and enjoyment.

109.    One example of the way funds were laundered in this case was through the use of a financial planner and stock broker, Person B, who holds himself out as a "tax reduction specialist" who assists individuals with asset protection. A bank account was opened at a Wells Fargo branch located in Mississippi in the name of Intellectual Property Management Services, LLC (IPMSI), which listed Person B's address, which is outside the State of Mississippi.

110.    Person B assisted many of the individuals involved in the fraud in creating shell companies that held accounts at various financial institutions. These holding companies were named "IPMSI Holdings, LLC, Series," followed by a letter designated to the holder of the account.

111.     Hope Thomley, Randy Thomley, Walters, Joele Smith, Randel Smith, Charles C. Smith, Beach, and Spell each owned IPMSI accounts.  For instance, Hope Thomley controlled IPMSI Holdings, LLC, Series B and Walters controlled IPMSI Holdings, LLC, Series C.  Person B was paid a fee to "manage" these accounts.  However, the funds were never truly out of the control of their owners.

112.     The individuals holding IPMSI LLCs accounts used them to launder the fraud proceeds through a series of transfers designed to obscure the source of the funds.  For instance, Asset A-003 was an account with The First Bank with account number x2660 and held in the name IPMSI Holdings, LLC, Series B, with authorized signer Hope E. Thomley.

113.     Asset A-003 was used to fund Asset A-021, an account with The First Bank with account number x1605, and in the name of Thomley Properties, LLC, with authorized signers Hope E. Thomley and Randy Thomley.

114.     A-021 transferred funds to at least two others accounts and was used to fund the purchase of at least seven real properties.

115.     Asset A-003 received at least $3,957,500.00 in transfers traceable to the source accounts for Advantage Pharmacy and World Health.  Part of this amount came through various accounts from the source account for World Health.  The remainder came through Asset A-031.

116.     Asset A-031 was a Wells Fargo Bank account number x6960, an account in the name of Intellectual Property Management Services (IPMSI), LLC, with authorized signers Jonathan McFadden, Hope E. Thomley, and Wade Walters.  Asset A-031 received at least $28,278,030.22 in transfers tied to the Source Accounts for Advantage and Medworx.  In addition to Asset A-003, Asset A-031 funded at least 19 other accounts.

36

117.    A visual representation of the funds movements described above related to IPMSI follows:



118.    Another example of the sophisticated scheme to transfer funds and disguise the nature of their source involves funds the purchase of Asset B-032, a 2014 Correct Craft 23' Boat with Hull ID CTC44125J34, Vessel #MS2959BW and Trailer Serial Number 4WASB3024C1000009, with all attachments thereon, registered to Spell.  The funds used to purchase this boat were derived from World Health and Advantage Pharmacy.

119.    This vessel was originally purchased by Walters with funds from Asset A-011, Regions account number x8314, an account in the name of Performance Accounts Receivable, LLC, with authorized signers Jonathan McFadden, Chandler Smith, Dolly Walters, and Wade Walters.

120.    Asset A-011 received at least $135,000 from Asset A-004, Regions account number x0052, an account in the name of Wade Walters Consulting, Inc., with authorized signers Jonathan McFadden, Chandler Smith, Dolly Walters, and Wade Walters. Asset A-011 also received $1,256,250.00 from multiple lines of credit issued by Regions Bank. The lines of credit were paid with funds from Asset A-004.

121.    Asset A-004 received at least $2,973,594.95 from the source accounts for World Health through an account in the name of Prime Care Marketing, Regions #9290, and an account in the name of Total Care Marketing, The First #1142. Asset A-004 also received funds from Asset A-019, The First account number x1365, an account in the name of Total Care Marketing, LLC, with authorized signers Jonathan McFadden, Hope E. Thomley, and Howard "Randy" Thomley. Total Care Marketing was the exclusive marketer for Advantage Pharmacy and received a kickback of approximately 50% for all compounded prescriptions filled by Advantage, including those reimbursed by federal health care plans. Asset A-019, which was the primary account for Total Care Marketing, was funded with $66,596,847.02 from the primary source account for Advantage Pharmacy.

122.    As set out above, Walters purchased Asset B-032 with the proceeds of the scheme to defraud and then subsequently transferred title of the vessel to Thomas E. Spell, Jr. as a sales incentive related to Medworx. A visual representation of the movement of funds involved in the

38

purchase of Asset B-032 follows:



123.    Through these and other methods, World Health, Advantage, Medworx and their associated individuals laundered the proceeds of the frauds.  The following demonstrates in more detail how each pharmacy used shell companies, accounts, and various types of property to launder their funds and use their laundered fraud proceeds to acquire the Defendant Property.

### A.    <u>World Health</u>

124.    World Health's primary Source account was Asset A-001, Bancorp South Bank account number x3983, an account in the name of World Health Industries Inc. with authorized signers David Rutland, Robert Durham, Nicole Hotard, and Cynthia Rocray (hereinafter WORLD HEALTH #1).

125.    World Health deposited payments from TRICARE and private insurance companies as a result of claims submitted for prescriptions allegedly filled into WORLD HEALTH #1. Between January 2012 and July 2015. World Health deposited at least $91,459,794.01 from TRICARE claim payments into WORLD HEALTH #1. World Health used WORLD HEALTH #1 to fund other accounts, which were then used to pay kickbacks and conceal the proceeds of the fraud as they were disbursed to co-conspirators.

126.    $1,001,417.67 was ultimately seized from WORLD HEALTH #1. The remainder was dispersed through "pass-through" accounts to "recipient accounts" or used to purchase personal or real property. Funds often transferred through more than one pass-through account before being moved to a recipient account. An overview of the funds that flowed through WORLD HEALTH #1 and ultimately to one or more defendant properties follows:



TRICARE & Private Insurance Companies

Various PBMs and EPIC

**SOURCE ACCOUNT**
WORLD HEALTH INDUSTRIES, INC (WORLD HEALTH #1) – Bancorp #3983

**PASS THROUGH ACCOUNTS**

- IPMSI HOLDINGS, LLC, Series C – The First #2454
- IPMSI HOLDINGS, LLC, Series B – The First #2660
- WADE WALTERS CONSULTING, INC – Regions #0052
- WADE WALTERS CONSULTING, INC – Regions #9398
- WADE A. WALTERS & DOLLY WALTERS – Regions #8418
- DAVID JASON RUTLAND – Bancorp #7430
- RUTLAND COMPANY LLC – Bancorp #0665

**RECIPIENT ACCOUNTS & ASSETS PURCHASED**

- P3 IN A POD, LLC – The First #0878
- IPMSI HOLDINGS, LLC Series AA – The First #2652
- PERFORMANCE ACCOUNTS REVEIVABLE, LLC – Regions #8314
- PRIME CARE REVENUE MANAGEMENT, LLC – Regions #5203
- PRIME CARE MANAGEMENT GROUP – Regions #6447
- PERFORMANCE CAPITAL LEASING, LLC – Regions #4243
- WORLD HEALTH HOLDINGS COMPANY, INC – Bancorp #7760
- WORLD HEALTH JETS, LLC – Bancorp #3324
- 2015 Super Air Nautique – G23, Hull Number CTC54385C515
- 2014 Correct Craft – Hull Number CTC44125J81
- 2013 Mercedes Benz G550 – VIN WDYC3HF9DX212259
- 2015 Ford F-150 – VIN 1FTEW1EF3FFA26041
- 2014 Mercedes Benz E350 – VIN WDDHF5KB8EA888307
- Mercedes Benz SL 400 – VIN WDDJK6FA0FF035487
- Mercedes Benz GL 550 – VIN 4JGDF7DE0FA567032
- 2008 Porsche 911 – VIN WPOCD299X85788297
- 2014 Mercedes Benz C Class – VIN WDDGJ7HB5EG187198
- 2014 Land Rover – VIN SALWR2EF3EA33671 4
- 2012 Mercedes Benz ML3 – VIN 4JGA5HB6CA023861
- 2015 Mercedes Benz GL – VIN 4JGDF2EE3FA577183
- 2016 Dodge Ram 5500 – VIN 3C7WRNFL5GG179742
- 2014 Chevrolet Silverado 3500 – VIN 1GB4CZC83EF173325
- 2016 Mercedes Benz CLS63AMG S, VIN WDDLJ7GB8GA172166
- 2278 Martin Road Bolton, Hinds County, MS
- 104 Bocage Ct. Hattiesburg, Lamar County, MS
- 80 Sandy Creek Dr. Santa Rosa Beach, Walton County, Florida
- Parcel 088-18007, Tallahatchie County, MS
- Parcel 088-19006, Tallahatchie County, MS
- Parcel 088-19007, Tallahatchie County, MS
- Parcel 088-19002, Tallahatchie County, MS
- 6131 Yeats Manor Dr., Tampa, Hillsborough County, FL
- 4944 Hickory Shores Blvd., Gulf Breeze, Santa Rosa County, FL
- 132 Dunlieth Way Clinton, Hinds County, MS
- Lot 16 (Parcel 2980-208-516) & Lot 18 (Parcel 2980-208-0518) Dunlieth Way, Clinton, Hinds County, MS

127.     As shown in the graph above, to facilitate the movement of the fraud proceeds, World Health used the following financial institutions: The First, a National Banking Association (The First); Bancorp South Bank (Bancorp); Regions Bank (Regions), and Wells Fargo Bank (WFB).

128.     World Health used the following entities as shell companies to conceal the fraud proceeds: Farm007, LLC; IPMSI Holdings, LLC, Series AA; IPMSI Holdings, LLC, Series B; IPMSI Holdings, LLC, Series C; P3 in a Pod, LLC; Performance Accounts Receivable, LLC; Performance Aviation, LLC; Performance Capital Leasing, LLC; Prime Care Management Group; Prime Care Revenue Management, LLC; Rutland Company, LLC; RX Pro of Mississippi, Inc; The Rutland Family Trust; Wade Walters Consulting, Inc.; Walters Consulting, Inc; World Health Holding Company, Inc; World Health Construction Management Group; and World Health Jets, LLC.

129.     The following individuals were the recipients of the proceeds of the fraud scheme, or were otherwise nominee recipients: Cynthia Rocray; David Jason Rutland; Charles C. Smith; Dolly Walters; Hope E. Thomley; Jonathan McFadden; Mitchell Chad Barrett; Morgan Hollingsworth; Nicole Hotard; Robert Allen Durham; Thomas Shoemaker; and Wade Walters.

130.     Because the participants in the frauds described in this Amended Complaint overlap, the proceeds earned by the various pharmacies and marketers were often commingled. The below assets represent those which involved funds traceable to WORLD HEALTH #1. Where indicated, these assets are also traceable to funds from the Source Accounts for Advantage and Medworx.

World Health Pass-Through Accounts

131.     The following assets were seized from accounts that were used by World Health as "pass-through accounts" to transfer funds and obfuscate the nature of the fraud proceeds:

132.     Asset A-002: $138,775.22 seized from The First account number x2454, an account in the name IPMSI Holdings, LLC, Series C, with authorized signers Jonathan McFadden, Dolly Walters, and Wade Walters.  This account received at least $784,000 in transfers traceable to ADVANTAGE #1, WORLD HEALTH #1, and MEDWORX #2 through various accounts including WFB #6960 [Asset A-031].  This account was used to fund other accounts.

133.     Asset A-003: $672,304.62 seized from The First account number x2660, an account in the name IPMSI Holdings, LLC, Series B, with authorized signer Hope E. Thomley.  This account received at least $3,957,500.00 in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through various accounts including WFB #6960 [Asset A-031].  This account was used to fund other accounts.

134.     Asset A-004: $448,586.98 seized from Regions account number x0052, an account in the name of Wade Walters Consulting, Inc., with authorized signers Jonathan McFadden, Chandler Smith, Dolly Walters, and Wade Walters.  This account received at least $5,048,724.16 in transfers traceable to ADVANTAGE #1, MEDWORX#1, MEDWORX #2, and WORLD HEALTH #1 through various accounts including The First #1365 [Asset A-019].

135.     Asset A-005: $330,496.54 seized from Regions account number x9398, an account in the name of Wade Walters Consulting, Inc., with authorized signer Wade Walters.  This account received at least $457,000.00 in transfers traceable to ADVANTAGE #1, WORLD

HEALTH #1, and MEDWORX #1 through Regions #0052 [Asset A-004].  This account was used to fund other accounts.

136.    Asset A-006: $242,222.91 seized from Bancorp account number x7430, an account in the name of David Jason Rutland.  This account received at least $2,392,345.94 in transfers from WORLD HEALTH #1.  This account was used to fund other accounts.

137.    Asset A-007: $31,534.15 seized from Bancorp account number x0665, an account in the name of Rutland Company, LLC, with authorized signer David Jason Rutland. This account received at least $211,000.00 in transfers from WORLD HEALTH #1.  This account was used to fund other accounts.

138.    Asset A-008: $1,905,238.23 seized from Regions account number x8418, an account in the name of Wade A. Walters & Dolly Walters, with authorized signers Dolly Walters and Wade Walters.  This account received at least $1,031,967.67 in transfers traceable to ADVANTAGE #1 and WORLD HEALTH #1 through Regions #0052 [Asset A-004] and Regions #9398 [Asset A-005].  This account also received $1,974,435.48 in funds traceable to MEDWORX #2 through WFB #9120.

World Health Recipient Accounts

139.    The following assets were seized from accounts that were used by World Health as "recipient accounts."  These accounts were the end point that collected fraud proceeds and were used by co-conspirators to enjoy the funds.

140.    Asset A-009: $1,192.91 seized from The First account number x0878, an account in the name of P3 in a Pod, LLC, with authorized signers Jonathan McFadden, Chandler Smith,

and Hope E. Thomley.  This account received at least $95,000.00 in transfers traceable to ADVANTAGE #1 and WORLD HEALTH #1 through Regions #0052 [Asset A-004].

141.    Asset A-010: $2,085.70 seized from The First account number x2652, an account in the name IPMSI Holdings, LLC, Series AA, with authorized signer Chandler Smith. This account received at least $660,560.00 in transfers traceable to ADVANTAGE #1 through various accounts including WFB #6960 [Asset A-031].

142.    Asset A-011: $529,197.81 seized from Regions account number x8314, an account in the name of Performance Accounts Receivable, LLC, with authorized signers Jonathan McFadden, Chandler Smith, Dolly Walters, and Wade Walters.  This account received at least $135,000.00 in transfers traceable to ADVANTAGE #1, WORLD HEALTH #1, and MEDWORX #1 through Regions #0052 [Asset A-004].  This account also received at least $1,256,250.00 from multiple Regions Bank Lines of Credit, which were then repaid with proceeds traceable to Regions #0052 [Asset A-004].

143.    Asset A-012: $227,230.38 seized from Regions account number x5203, an account in the name of Prime Care Revenue Management, LLC, with authorized signers Jonathan McFadden, Chandler Smith, Dolly Walters, and Wade Walters.  This account received at least $292,000.00 in transfers traceable to ADVANTAGE #1, WORLD HEALTH #1, and MEDWORX #1 through Regions #0052 [Asset A-004].

144.    Asset A-013: $82,300.00 seized from Regions account number x6447, an account in the name of Prime Care Management Group, with authorized signer Wade Walters.  This account received at least $101,000.00 in transfers traceable to ADVANTAGE #1, WORLD HEALTH #1 through REGIONS #0052 [Asset A-004].

145. Asset A-014: $153,179.87 seized from Regions account number x4243, an account in the name of Performance Capital Leasing, LLC, with authorized signers Jonathan McFadden, Chandler Smith, Dolly Walters, and Wade Walters. This account received at least $110,000.00 in transfers traceable to ADVANTAGE #1 and WORLD HEALTH #1 through Regions #0052 [Asset A-004].

146. Asset A-015: $727.06 seized from Bancorp account number x7760, an account in the name of World Health Holding Company, Inc., with authorized signers David Rutland, Robert Durham, and Cynthia Rocray. This account received at least $14,451,130.17 in transfers from WORLD HEALTH #1.

147. Asset A-016: $5,228.32 seized from Bancorp account number x3324, an account in the name of World Health Jets, LLC, with authorized signers Robert Allen Durham, David Jason Rutland, Mitchell Chad Barrett, and Cynthia Rocray. This account received at least $345,000.00 in transfers from WORLD HEALTH #1.

<u>Real and Personal Property Funded by World Health</u>

148. World Health also funneled fraud proceeds into personal property and real property, including the following assets:

149. Asset B-001: 2015 Super Air Nautique G23-23.00' Boat with Hull ID CTC54385C515 and Vessel #FlO630PX and a 2015 Tilt Tandem Trailer with VIN 5A7BB2321FT000422, with all attachments thereon, registered to Wade Walters. This vessel was purchased with $160,510.00 traceable to ADVANTAGE #1 and WORLD HEALTH #1 through various other accounts including Regions #0052 [Asset A-004].

150.     Asset B-002: 2013 Mercedes Benz G550, VIN WDYC3HF9DX212259, Tag MS LMF592, with all attachments thereon, registered to Wade Walters Consulting, Inc.  This vehicle was purchased on May 5, 2014 with $119,835.06 traceable to ADVANTAGE #1 and WORLD HEALTH #1 through various accounts including Regions #0052 [Asset A-004].

151.     Asset B-003: 2015 Ford F-150, VIN 1FTEW1EF3FFA26041, Tag MS LM5522, with all attachments thereon, registered to Walters Consulting, Inc.  This vehicle was purchased on March 6, 2015 with $41,008.47 traceable to ADVANTAGE #1 and WORLD HEALTH #1 through various accounts including Regions #0052 [Asset A-004].

152.     Asset B-004: 2014 Mercedes Benz E350, VIN WDDHF5KB8EA888307, Tag MS HRY613, with all attachments thereon, registered to RX Pro of Mississippi, Inc.  This vehicle was purchased on January 14, 2014 with $55,111.65 from WORLD HEALTH #1.

153.     Asset B-005: 2015 Mercedes Benz SL 400, VIN WDDJK6FA0FF035487, with all attachments thereon, registered to Wade Walters Consulting, Inc. This vehicle was purchased on April 1, 2015 with $38,673.90 traceable to ADVANTAGE #1, WORLD HEALTH #1, and MEDWORX #1 through WFB #3864 [Asset A-125], Regions #0052 [Asset A-004], and various other accounts.

154.     B-006: 2015 Mercedes Benz GL 550, VIN 4JGDF7DE0FA567032, Tag MS LML552, with all attachments thereon, registered to Wade Walters Consulting, Inc. This vehicle was purchased on April 1, 2015 with $92,827.65 traceable to ADVANTAGE #1, WORLD HEALTH #1, and MEDWORX #1 through Regions #0052 [Asset A-004] and various other accounts.

47

155.    Asset B-007: 2008 Porsche 911, VIN WPOCD299X8S788297, Tag MS P034J, with all attachments thereon registered to Thomas Shoemaker.  This vehicle was obtained through a trade for a 2010 Porsche 911, VIN WPOCA2A94AS740062, Tag MS HYR409.  The 2010 Porsche 911 was purchased with $65,422.65 from WORLD HEALTH #1.

156.    Asset B-008: 2014 Mercedes Benz C Class, VIN WDDGJ7HB5EG187198, Tag MS HYR410, with all attachments thereon, registered to Farm007, LLC or Thomas Shoemaker. This vehicle was purchased with $68,677.65 from WORLD HEALTH #1.

157.    Asset B-009: 2014 Land Rover, VIN SALWR2EF3EA336714, Tag MS HSC678, with all attachments thereon, registered to World Health Industries, Inc. This vehicle was purchased with $109,808.71 traceable to WORLD HEALTH #1 through Bancorp South #7430 [Asset A-006].

158.    Asset B-010: 2012 Mercedes Benz ML3, VIN 4JGA5HB6CA023861, Tag MS HSG642, with all attachments thereon, registered to Farm007, LLC.  This vehicle was purchased with $44,317.65 from WORLD HEALTH #1.

159.    Asset B-013: 2015 Mercedes Benz GL, VIN 4JGDF2EE3FA577183, Tag MS HYQ545, with all attachments thereon, registered to Morgan Hollingsworth.  This vehicle was purchased with $52,287.26 traceable to WORLD HEALTH #1 through Bancorp #7430 [Asset A-006].

160.    Asset B-014: 2016 Dodge Ram 5500, VIN 3C7WRNFL5GG179742, with all attachments thereon, registered to The Rutland Company, LLC.  This vehicle was obtained through a trade for a 2015 GMC Sierra, VIN 1GT12ZE85FF122974, Tag MS B103AQ469.  The

2015 GMC Sierra was purchased with $62,305.91 traceable to WORLD HEALTH #1 through

Bancorp #0665 [Asset A-007].

161. Asset B-015: 2014 Chevrolet Silverado 3500, VIN 1GB4CZC83EF173325, Tag

MS B103AQ274, with all attachments thereon, registered to World Health Construction

Management Group. This vehicle was purchased with $44,136.38 from WORLD HEALTH #1.

162. Asset B-031: 2016 Mercedes-Benz CLS63AMG S, VIN

WDDLJ7GB8GA172166, with all attachments thereon, registered to Chad Barrett and Brew

Barr, LLC. This vehicle was obtained through a trade on December 19, 2015 for two vehicles: a

2012 Mercedes-Benz CLS63AMG, VIN WDDLJ7EB8CA044183; and a 2014 Mercedes-Benz

GL350, VIN 4JGDF2EE9EA281311. The 2012 Mercedes-Benz CLS63AMG, VIN

WDDLJ7EB8CA044183 was purchased with $15,000.00 traceable to WORLD HEALTH #1.

The 2014 Mercedes-Benz GL350, VIN 4JGDF2EE9EA281311 was purchased with $86,643.12

traceable to WORLD HEALTH #1.

163. Asset C-001: 2278 Martin Road Bolton, Hinds County, Mississippi (296.31

Acres) including parcels 4967-545, 4967-545-1, 4967-546, 4967-546-3, 4967-546-4,4967-546-5

& 4967-547-2, further described in Attachment A, titled to the Rutland Family Trust. This

property was purchased for approximately $975,000 of which at least $590,888.86 (including

$83,203 to mortgage) traceable to WORLD HEALTH #1 through two other accounts.

Additionally, at least $389,000 traceable to WORLD HEALTH #1 was used to make

improvements to the property.

164. Asset C-002: 104 Bocage Ct., Hattiesburg, Lamar County, MS, titled to Wade A.,

and Dorothy H. Walters. Between February 2013 and January 2016, $224,657.11 traceable to

49

WORLD HEALTH #1 and ADVANTAGE #1 through Regions #0052 [Asset A-004], The First #1142, Regions #9290, and The First #1365 [Asset A-019], was used to pay the mortgage of this property.

165.    Asset C-003: Parcel 088-18007, Tallahatchie County MS, titled to Wade A. Walters. This property was purchased along with Asset C-004 and Asset C-005 for $134,844.69 traceable to WORLD HEALTH #1 and ADVANTAGE #1 through Regions #0052 [Asset A-004], The First #1142, Regions #9290, and The First #1365 [Asset A-019].

166.    Asset C-004: Parcel 088-19006, Tallahatchie County, MS, titled to Wade A. Walters. This property was purchased along with Asset C-003 and Asset C-005 for $134,844.69 traceable to WORLD HEALTH #1 and ADVANTAGE #1 through Regions #0052 [Asset A-004], The First #1142, Regions #9290, and The First #1365 [Asset A-019].

167.    Asset C-005: Parcel 088-19007, Tallahatchie County, MS, titled to Wade A. Walters. This property was purchased along with Asset C-003 and Asset C-004 for $134,844.69 traceable to WORLD HEALTH #1 and ADVANTAGE #1 through Regions #0052 [Asset A-004], The First #1142, Regions #9290, and The First #1365 [Asset A-019].

168.    Asset C-006: Parcel 088-19002, Tallahatchie County, MS, titled to Wade Walters Consulting Inc. This property was purchased with $215,136.50 traceable to ADVANTAGE # 1 and WORLD HEALTH #1 through Regions #0052 [Asset A-004], The First #1142 , and Regions #9290, and The First #1365 [Asset A-019].

169.    Asset C-007: Parcel 098-3401201 Tallahatchie County, MS, titled to Walters Holdings LLC. This property was purchased with $15,579.50 proceeds traceable to ADVANTAGE #1 and WORLD HEALTH #1 through Magnolia #0072,  NY Life  3174,  WFB

#6960 [Asset A-031], The First #2685, Regions #0052 [Asset A-004], The First #1365 [Asset A-019], NY Life #3174, WFB #6960 [Asset A-031], The First #1142, and The First #2685.

170.    Asset C-008: 6131 Yeats Manor Dr., Tampa, Hillsborough County, FL, titled to David Haws and Hope Haws. This property was purchased with $521,127.70 traceable to ADVANTAGE #1 and WORLD HEALTH #1 through Magnolia #0072, WFB #6960 [Asset A-031], The First #2685, Regions #0052 [Asset A-004], The First #1365 [Asset A-019], NY Life #3174, WFB #6960 [Asset A-031], The First #1142, and The First #2685.

171.    Asset C-009: 4944 Hickory Shores Blvd., Gulf Breeze, Santa Rosa County, FL, titled to Chad and Jonnita Barrett.  This property was purchased with $1,906,280.16 traceable to WORLD HEALTH #1 through Bank Plus #0111 and Bancorp #3076.

172.    Asset C-010: 132 Dunlieth Way Clinton, Hinds County, MS, titled to Brew Barr LLC. This property was purchased with $485,238.75 traceable to WORLD HEALTH #1 through Bank Plus #0111 and Bancorp #3076.

173.    Asset C-011: Lot 16 (Parcel 2980-208-516) and Lot 18 (Parcel 2980-208-518), Dunlieth Way, Clinton, Hinds County, MS, titled to Brew Barr LLC. This property was purchased with $69,758.43 traceable to WORLD HEALTH #1 through Bank Plus #0111 and Bancorp #3076.

174.    Asset C-012: 80 Sandy Creek Dr., Santa Rosa Beach, Walton County, Florida, titled to Wade A Walters & Dorothy H. Walters. This property was purchased with at least $897,164.90 traceable to ADVANTAGE # 1 through Regions #0052 [Asset A-004] and The First 1365 [Asset A-019] and WORLD HEALTH #1 through Regions #8314 [Asset A-011] and Regions #9290.

### B.  **Advantage Pharmacy**

175.  Advantage's primary Source Account was Asset A-017, Citizens National Bank account number x3786, an account in the name of Advantage Pharmacy, LLC with authorized signers Glen Doyle Beach and Todd Nace (hereinafter ADVANTAGE #1).

176.  Advantage Pharmacy deposited payments for claims from TRICARE, other federal health care programs, and private insurance companies into ADVANTAGE #1.  Between October 2012 and February 2015, Advantage deposited at least $135,911,631.43 from TRICARE claim payments into this account.  ADVANTAGE #1 was also used to fund other accounts, which were used to pay kickbacks and to conceal the proceeds of illegal activity as they were disbursed to co-conspirators.

177.  $1,567,980.07 was ultimately seized from ADVANTAGE #1.  The remainder was dispersed through "pass-through" accounts to "recipient accounts" or used to purchase personal or real property.  Funds often transferred through more than one pass-through account before being moved to a recipient account.

178.  A visual overview of the money flow related to the fraud proceeds received by Advantage Pharmacy and used to fund various items of Defendant Property follows:



TRICARE & Private Insurance Companies

Various PBMs and EPIC

**SOURCE ACCOUNT**
ADVANTAGE PHARMACY, LLC (ADVANTAGE #1) – Citizens National Bank #3786

**PASS THROUGH ACCOUNTS**

- PHYSIQUE PRO, LLC – Citizens #2333
- PHYSIQUE PRO, LLC – The First #0820
- TOTAL CARE MARKETING, LLC – The First #1365
- UNITED BUSINESS VENTURES, LLC –The First #2685
- THOMLEY PROPERTIES, LLC – The First #1605
- JOELE SMITH – The First #1275
- RANJO HOLDINGS, LLC – The First #0739
- DWWW, LLC – Regions #9401
- TLC RX, LLC – Regions #8585
- ADVANTAGE MARKETING PROFESIONNALS, LLC – Magnolia #1395
- LIL MAD CONSULTING, LLC – Magnolia #1155
- IPMSI HOLDINGS, LLC Series E – Priority #6328
- N&P FARMS, LLC – Priority #3176
- IPMSI LLC – Wells Fargo #6960
- IPMSI, LLC – 1st Source #6883
- IPMSI HOLDINGS, LLC , Series C – NY Life IA #5270
- IPMSI HOLDINGS, LLC , Series F – NY Life IA #5289
- IPMSI HOLDINGS, LLC , Series B – NY Life IA #5297
- IPMSI HOLDINGS, LLC , Series B – NY Life IA #1512-1
- IPMSI HOLDINGS, LLC , Series C – NY Life IA #1519-1
- DWWW, LLC – NY Life IA #1505
- HOPE THOMLEY HOLDINGS, LLC – NY Life IA #2525
- HOWARD THOMLEY HOLDINGS, LLC – NY Life IA #2526
- AF QP, LLC – NY Life IA #4902
- HH QP, LLC – NY Life IA #4886
- TW QP, LLC – NY Life #4903
- HOPE EVANGELINE THOMLEY – The First #7760
- RANJO LOUISIANA PROPERTIES, LLC – The First #0812
- WADE WALTERS CONSULTING, INC. – Regions #9629

**RECIPIENT ACCOUNTS & ASSETS PURCHASED**

- JOELE SMITH – Citizens #3199
- THOMLEY CHRISTMAS TREE FARM, LLC – The First #1316
- BONE FOREST, LLC – The First #2538
- PHYSIQUE PRO, LLC-Tax Accounts – The First #0903
- RANJO AVIATION, LLC – The First #0911
- SOLAS MARKETING, LLC – The First #1795
- PERFORMANCE AVIATION, LLC – Regions #9266
- GLENN DOYLE BEACH and TRACI BEACH – Regions #9361
- GLENN DOYLE BEACH and TRACI BEACH – Regions #5051
- WALTERS HOLDINGS, LLC – Magnolia #1072
- ADVANTAGE MEDICAL INFUSION – Priority #2814
- DEVELOPMENT INDUSTRIES, INC – Priority #3283
  - **CONTINUE ON PAGE 2**

53

**RECIPIENT ACCOUNTS & ASSETS PURCHASED**

- JCM, LLC – Bancorp #2178
- JASON or KELSEY MAY – Bancorp #4011
- JOELE SMITH – NY Life IP #5370
- HOPE THOMLEY – NY Life IP #4930
- HOWARD RANDELL THOMLEY – NY Life IP #4927
- IPMSI HOLDINGS, LLC Series B – NY Life IA #1513
- IPMSI HOLDINGS, LLC Series B – NY Life IA #1514
- IPMSI HOLDINGS, LLC Series B – NY Life IA #1515
- IPMSI HOLDINGS, LLC Series B – NY Life IA #1517
- IPMSI HOLDINGS, LLC Series B – NY Life IA #1518
- IPMSI HOLDINGS, LLC Series C – NY Life IA #1520
- IPMSI HOLDINGS, LLC Series C – NY Life IA #1522
- IPMSI HOLDINGS, LLC Series C – NY Life IA #1523
- IPMSI HOLDINGS, LLC Series C – NY Life IA #1524
- IPMSI HOLDINGS, LLC Series C – NY Life IA #1525
- DWWW, LLC – NY Life IA #1507
- DWWW, LLC – NY Life IA #1508
- DWWW, LLC – NY Life IA #1509
- DWWW, LLC – NY Life IA #1510
- DWWW, LLC – NY Life IA #1511
- HOPE THOMLEY HOLDINGS, LLC – NY Life IA #2522
- HOPE THOMLEY HOLDINGS, LLC – NY Life IA #2523
- HOPE THOMLEY HOLDINGS, LLC – NY Life IA #2524
- HOPE THOMLEY HOLDINGS, LLC – NY Life IA #2521
- HOWARD THOMLEY HOLDINGS, LLC – NY Life IA #2527
- HOWARD THOMLEY HOLDINGS, LLC – NY Life IA #2528
- HOWARD THOMLEY HOLDINGS, LLC – NY Life IA #2529
- HOWARD THOMLEY HOLDINGS, LLC – NY Life IA #2530
- WW QP HOLDINGS, LLC – NY Life IA #4625
- AF QP, LLC – NY Life IA #4906
- AF QP, LLC – NY Life IA #4908
- AF QP, LLC – NY Life IA #4909
- AF QP, LLC – NY Life IA #4911
- LILMAD CONSULTING, LLC Retirement Plan – Brinker #9484
- PHYSIQUE PRO, LLC Retirement Plan – Brinker #1231
- PHYSIQUE PRO, LLC Retirement Plan – Brinker #1232
- TLC RX, LLC Retirement Plan – Brinker #7448
- TLC RX, LLC Retirement Plan – Brinker #7079
- UBV, LLC Retirement Plan – Brinker #9431
- UBV, LLC Retirement Plan – Brinker #9499
- HH QP, LLC – NY Life IA #4882
- HH QP, LLC – NY Life IA #4883
- HH QP, LLC – NY Life IA #4884
- HH QP, LLC – NY Life IA #4885
- TW QP, LLC – NY Life IA #4910
- TW QP, LLC – NY Life IA #4912
- TW QP, LLC – NY Life IA #4913
- TW QP, LLC – NY Life IA #4907
- Cirrus Design Corporation Aircraft – SR22T, Tail Number N729DW
- $1,621,556 USC (Proceeds of Lear Jet N36866 sale)
- 2015 Mercedes Benz G550 – VIN DYCYC3HFXFX233494
- 2014 Porsche Panamera – VIN WP0AA2A72EL010995
- 2013 Ford F-150 Crew Cab – VIN 1FTFW1R60DFC54655
- 2012 Ford F-150 Raptor – VIN 1FTFW1R60CFA22698
- 2010 Dodge Ram 2500 – VIN 3D7UT2CL0AG108633

**RECIPIENT ACCOUNTS & ASSETS PURCHASED**

- 2014 Audi Q7 – VIN WA1DGAFE0ED016621
- 2013 Jeep Wrangler – VIN 1C4HJWEG8DL579557
- 2012 Dodge Ram 2500 – VIN 3C6UD5PL0CG199450
- 650 Black Creek road, Sumrall, Lamar County, MS
- 13 Cross Key Big Bay Lot 3, 29 Cross Key Big Bay Lot 7, and 33 Cross Key Big Bay Lot 8, Lamar County, MS
- Lot 3 Pier Point, Big Bay Lake, Lamar County, MS
- Lot 8 Fisher Point, Big Bay Lake, Lamar County, MS
- Lots 5, 16, & 42  Lure Line Big Bay Lake, Lamar County, MS
- Parcel 055Q-22-031.001, 10 acres on Oak Grove Road, Hattiesburg, Lamar County, MS
- Parcel 101Q-12-053-001 (Bocage Ct.) Hattiesburg, Lamar County, MS
- Parcels 103-06-001.002/103-07-006.000/103-07-006.001/151-01-026.000/151-01-027.000/151-02-010.000/161-12-001.000 at North Black Creek Road, Sumrall, Lamar County, MS
- Parcels 103-07-010.00, Sumrall, Lamar County, MS
- Parcel 103-06-003.002 (625 North Black Creek Road), Sumrall, Lamar County, MS
- Parcels 054-26002/054-26003/054-26004  in Tallahatchie County, MS
- **6131 Yeats manor Dr. Tampa, Hillsborough County, FL**
- **800 College Hill Rd. Apt 2302 Oxford, Lafayette County, MS**
- 321 Steelman Rd. Hattiesburg, Lamar County, MS
- Lot 2, Ballantrae Subdivision, Lamar County, MS
- Lot 11, Big Bay Lake, Fisher Pointe, Lamar County, MS
- 10 Cotton Tail Way W. Purvis, Lamar County, MS
- 15 Tuscan Lane and 19 Tuscan Lane, Sumrall, Lamar County MS
- 120 Bellegrass Blvd, Hattiesburg, Lamar County, MS
- Lot 9, Big Bay Lake Community, Fisher Pointe Neighborhood, Lamar County, MS
- Lot D-2 & D-3 Providence Subdivision, Forrest County, MS
- Parcels 1-005-04-019.04 & 1-005-03-028.00 Forrest County MS
- Lots 6-26, 28-36, 40 & 41 Rabbit Run Subdivision, Tangipahoa Parish, LA
- Tract B, Block 25 Barber Addition, Hammond, Tangipahoa Parish, LA
- 320 Grandmas Lane, Fayetteville, Fayette County, GA
- 23 Deer Valley Dr. Hattiesburg, Lamar County, MS
- 50 Hegwood  Dr. Hattiesburg, Lamar County, MS
- 197 Canebrake Blvd. Hattiesburg, Lamar County, MS
- 56 98 Place Blvd. Hattiesburg, Lamar County, MS
- 775 Gulf Shore Dr. #36, #9136, #2154, #2085, #9104 Destin, Okalosoa County, FL
- Parcel 164-20-042.000 (Hwy. 44), Parcel 165-21-020.000 (Foster Rd.), Parcel 165-22-007.000 (JD Hatten Rd.), Parcel 165-22-023.000 (Foster Rd.), and Parcel 168-28-001.000 (Foster Rd.), Lamar County, MS
- 47 Copper Creek, Hattiesburg, Lamar County, MS
- 123 Higgins Rd. Sumrall, Lamar County, MS

179.    To facilitate the movement of the fraud proceeds, Advantage Pharmacy used the following financial institutions: 1st Source Bank (1st Source); Bancorp; Citizens Bank (Citizens); Magnolia State Bank (Magnolia); NY Life, IA and IP; Priority One Bank (Priority); Regions; The First; and WFB.

180.    Advantage Pharmacy used accounts held by the following entities to move the fraud proceeds: Advantage Marketing Professionals, LLC; AF QP, LLC; AMI Rx; Bone Forest, LLC; BPCK Nichols, LLC; David Haws; DWWW, LLC; Hope Thomley Holdings, LLC; Intellectual Property Management Services ("IPMSI"), LLC; IPMSI Holdings LLC, Series B; IPMSI Holdings LLC, Series C; IPMSI Holdings, LLC Series E; IPMSI Holdings LLC, Series F; JCM, LLC; Leaf River Investments, LLC; Lil Mad Consulting, LLC; Lilmad Consulting, LLC Retirement Plan; N&P Farms, LLC; Performance Aviation, LLC; Physique Pro, LLC; Physique Pro, LLC, Retirement Plan; Physique Pro, LLC-Tax Accounts; Ranjo Aviation, LLC; Ranjo Holdings, LLC; Ranjo Louisiana Properties, LLC; Schillace Construction LLC; Solas Marketing, LLC; Thomley Christmas Tree Farm, LLC; Thomley Properties, LLC; TLC RX, LLC; TLC RX, LLC Retirement Plan; Total Care Marketing, LLC; UBV, LLC Retirement Plan; United Business Ventures LLC; Walters Holdings, LLC; and WW QP Holdings, LLC.

181.    The following individuals were the recipients of the proceeds of the fraud scheme, or were otherwise nominee recipients: Alison Frame; Bonnie Smith; Brooke Braley; Chandler Smith; Dorothy (Dolly) Walters; Garrett Braley; Glenn Doyle Beach; Glenn Doyle Beach, Jr.; Hope Haws; Hope E. Thomley; Howard "Randy" Thomley; Jason May; Joele Smith; Jonathan McFadden; Kelsey May; Randel Smith; Stephen T. Mellinger, Jr.; Traci Beach; Wade Walters; and William Christopher Pierce.

182.     Because some of the individuals involved in the frauds were involved with more than one of the pharmacies, proceeds from the various pharmacies were often commingled.  The below assets represent those which involved funds traceable to ADVANTAGE #1 but which were not previously included under the discussion of World Health.  These assets may also include funds derived from the Source Accounts for Medworx.

Advantage Pharmacy Pass-Through Accounts

183.     The following assets were seized from accounts that were used by Advantage as "pass-through accounts" to transfer funds and obfuscate the nature of the fraud proceeds:

184.     Asset A-018: $307.26 seized from Citizens account number x2333, an account in the name of Physique Pro, LLC, with authorized signer Joele Smith. This account received at least $11,052,185.98 in transfers from ADVANTAGE #1.  This account was used to fund other accounts.

185.     Asset A-019: $67,257.24 seized from The First account number x1365, an account in the name of Total Care Marketing, LLC, with authorized signers Jonathan McFadden, Hope E. Thomley, and Howard "Randy" Thomley.  This account received at least $66,596,847.02 in transfers from ADVANTAGE #1.  This account was used to fund other accounts.

186.     Asset A-020: $513,692.49 seized from The First account number x2685, an account in the name of United Business Ventures LLC, with authorized signers Hope E. Thomley and Randy Thomley.  This account received at least $5,047,621.71 in transfers from ADVANTAGE #1.  This account was used to fund other accounts.

187.     Asset A-021: $570,314.01 seized from The First account number x1605, an account in the name of Thomley Properties, LLC, with authorized signers Hope E. Thomley and Randy Thomley.  This account received at least $1,660,000.00 in transfers traceable to ADVANTAGE #1 through various accounts including, The First #2660 [Asset A-003] and NY Life IA #5297 [Asset A-035].  This account was used to fund other accounts.

188.     Asset A-022: $47,914.28 seized from The First account number x1275, an account in the name of Joele Smith.  This account received at least $2,281,139.99 in transfers from ADVANTAGE #1.  This account was used to fund other accounts.

189.     Asset A-023: $71,303.94 seized from The First account number x0739, an account in the name of Ranjo Holdings, LLC, with authorized signers Joele Smith and Randel Smith. This account received at least $499,175.62 in transfers traceable to ADVANTAGE #1 through various accounts including NY Life IA #5289 [Asset A-034].  This account was used to fund other accounts.

190.     Asset A-024: $198,974.22 seized from The First account number x0820, an account in the name of Physique Pro, LLC, with authorized signers Joele Smith and Randel Smith.  This account received at least $5,497,403.07 in transfers from ADVANTAGE #1. This account was used to fund other accounts.

191.     Asset A-025: $4,794,772.12 seized from Regions account number x9401, an account in the name of DWWW, LLC, with authorized signer Wade Walters. This account received at least $7,571,432.56 in transfers from ADVANTAGE #1.  This account was used to fund other accounts.

192.    Asset A-026: $24,425.11 seized from Regions account number x8585, an account in the name of TLC RX, LLC, with authorized signer Traci Beach.  This account received at least $4,243,072.52 in transfers from ADVANTAGE #1.  This account was used to fund other accounts.

193.    Asset A-027: $3,465.86 seized from Magnolia account number x1395, an account in the name of Advantage Marketing Professionals, LLC, with authorized signers Chandler Smith and Howard Randel Thomley.  This account received at least $19,959,279.94 in transfers traceable to ADVANTAGE #1 through The First #1365 [Asset A-019].  This account was used to fund other accounts.

194.    Asset A-028: $4,894.44 seized from Magnolia account number x1155, an account in the name of Lil Mad Consulting, LLC, with authorized signers Bonnie Smith and Chandler Smith. This account received at least $3,154,045.21 in transfers traceable to ADVANTAGE #1 through Magnolia #1395 [Asset A-027].  This account was used to fund other accounts.

195.    Asset A-029: $2,953,435.80 seized from Priority account number x6328, an account in the name of IPMSI Holdings, LLC Series E, with authorized signer Glenn Doyle Beach.  This account received at least $2,344,000.00 in transfers from ADVANTAGE #1 and MEDWORX #2 through Regions #8585 [Asset A-026] and WFB #6960 [Asset A-031].  This account also received at least $2,776,300.80 traceable to ADVANTAGE #1 and MEDWORX #2 through 1st Source #6883 [Asset A-032] and Regions #8585 [Asset A-026].  This account was used to fund other accounts.

196.    Asset A-030: $342,755.98 seized from Priority account number x3176, an account in the name of N&P Farms, LLC, with authorized signer Glenn Doyle Beach. This

account received at least $200,000.00 in transfers traceable to ADVANTAGE #1 from Regions #8585 [Asset A-026].  This account was used to fund other accounts.

197.    Asset A-031: $64,745.86 seized from WFB account number x6960, an account in the name of Intellectual Property Management Services (IPMSI), LLC, with authorized signers Jonathan McFadden, Hope E. Thomley, and Wade Walters.  This account received at least $28,278,030.22 in transfers from numerous accounts by the co-conspirators and was utilized as a flow-through to other accounts to conceal the proceeds of specified unlawful activities from ADVANTAGE #1 and MEDWORX #2.  This account was used to fund other accounts.

198.    Asset A-032: $415,717.75 seized from 1st Source account number x6883, an account in the name of Intellectual Property Management Services, LLC, with authorized signer Stephen T. Mellinger, Jr.  This account received at least $1,800,000.00 in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through WFB #6960 [Asset A-031].  This account was used to fund other accounts.

199.    Asset A-033: $490,088.35 seized from NY Life IA, account number x5270, an account in the name of IPMSI Holdings LLC, Series C, with authorized signers Wade Walters and Dorothy (Dolly) Walters.  This account received at least $3,318,611.64 in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through WFB #6960 [Asset A-031].  This account was used to fund other accounts.

200.    Asset A-034: $168,922.72 seized from NY Life IA account number x5289, an account in the name of IPMSI Holdings LLC, Series F, with authorized signers Joele Smith and Randel Smith.  This account received at least $940,000.00 in transfers traceable to

ADVANTAGE #1 through WFB #6960 [Asset A-031]. This account was used to fund other accounts.

201.     Asset A-035: $1,317,217.30 seized from NY Life IA account number x5297, an account in the name of IPMSI Holdings LLC, Series B, with authorized signers Hope E. Thomley and Howard "Randy" Thomley.  This account received at least $2,940,000.00 in transfers traceable to ADVANTAGE #1 through WFB #6960 [Asset A-031]. This account was used to fund other accounts.

202.     Asset A-036: $12.05 seized from NY Life IA x1512-1, an account in the name of IPMSI Holdings, LLC, Series B.  This policy received at least $2,094,408.44 in transfers traceable to ADVANTAGE #1 through NY Life IA #5297 [Asset A-035] and WFB #6960 [Asset A-031].  This account was used to fund other accounts.

203.     Asset A-037: $4.27 seized from NY Life IA x1519-1, an account in the name of IPMSI Holdings, LLC, Series C.  This policy received at least $1,370,564.00 in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #5270 [Asset A-033] and various other accounts.  This account was used to fund other accounts.

204.     Asset A-038: $1.64 seized from NY Life IA x1505, an account in the name of DWWW, LLC, with authorized signer Wade Walters.  This account received at least $2,000,000.00 in transfers traceable to ADVANTAGE #1 through Regions #9401.  This was a "parent account" which was used to fund sub-accounts.

205.     Asset A-039: $.16 seized from NY Life IA x2525, an account in the name of Hope Thomley Holdings, LLC, with authorized signer Hope E. Thomley.  This account received

at least 3,074,250.00 in transfers traceable to ADVANTAGE #1 through 1st Source #6883
[Asset A-032]. This was a "parent account" that was used to fund sub-accounts.

206.    Asset A-040: $.16 seized from NY Life IA x2526, an account in the name of
Howard Thomley Holdings, LLC, with authorized signer Howard "Randy" Thomley.  This
account received at least $3,074,250.00 in transfers traceable to ADVANTAGE #1 through 1st
Source #6883 [Asset A-032]. This was a "parent account" that was used to fund sub-accounts.

207.    Asset A-041: $3.74 seized from NY Life IA x4902, an account in the name of AF
QP, LLC, with authorized signer Alison Frame.  This account received at least $975,000.00 in
transfers traceable to ADVANTAGE #1 through Regions #4814 and various other accounts.
This was a "parent account" that was used to fund sub-accounts.

208.    Asset A-042: $3.74 seized from NY Life IA x4886, an account in the name of HH
QP, LLC, with authorized signer Hope Haws.  This account received at least $975,000.00 in
transfers traceable to ADVANTAGE #1 and MEDWORX #2 through WFB #6960 [Asset A-
031], Regions #4806, and various other accounts.  This was a "parent account" that was used to
fund sub-accounts.

209.    Asset A-043: $2.65 seized from NY Life IA x4903, an account in the name of
TW QP, LLC, with authorized signer Trace Walters.  This account received at least $645,000.00
in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through Regions #4822, WFB
#6960 [Asset A-031], Regions #4806, and various other accounts.  This was a "parent account"
that was used to fund sub-accounts.

210.    Asset A-044: $29,392.02 seized from The First account number x7760, an
account in the name of Hope Evangeline Thomley, with authorized signers Hope E. Thomley

and Randy Thomley.  This account received at least $349,184.56 in transfers from Magnolia #1395 [Asset A-027], which was funded in part with funds traceable to ADVANTAGE #1.

211.    Asset A-045: $206,256.58 seized from The First account number x0812, an account in the name of Ranjo Louisiana Properties, LLC, with authorized signers Joele Smith and Randel Smith.  This account received at least $188,161.36 in transfers traceable to ADVANTAGE #1 through various accounts including The First #0739 [Asset A-023].

212.    Asset A-149: $1,233,232.13 seized from Regions account number x9629, an account held in the name of Wade Walters Consulting, Inc., with authorized signers Jonathan McFadden, Chandler Smith, Dolly Walters, and Wade Walters. This account received at least $8,425,885.67 traceable to ADVANTAGE #1 through various accounts including, The First #1365 [Asset A-019] and The First #2685 [Asset A-020].

Advantage Pharmacy Recipient Accounts

213.    The following assets were seized from accounts that were used by Advantage as "recipient accounts."  These accounts were the end point that collected fraud proceeds and were used by co-conspirators to enjoy the funds.

214.     Asset A-046: $7,024.04 seized from Citizens account number x3199, an account in the name of Joele Smith, with authorized signer Joele Smith.  This account received at least $533,370.28 in transfers from ADVANTAGE #1.

215.    Asset A-047: $5,528.88 seized from The First account number x1316, an account in the name of Thomley Christmas Tree Farm, LLC, with authorized signers Hope E. Thomley and Randy Thomley.  This account received at least $305,000.00 in transfers traceable to ADVANTAGE #1 through The First #2685 [Asset A-020].

216.     Asset A-048: $59,935.47 seized from The First account number x2538, an account in the name of Bone Forest, LLC, with authorized signers Glenn Doyle Beach and Hope E. Thomley.  This account received at least $427,000.00 in transfers traceable to ADVANTAGE #1 through various accounts including The First #1605 [Asset A-021] and Priority #6328 [Asset A-029].

217.     Asset A-049: $204,591.92 seized from The First account number x0903, an account in the name of Physique Pro, LLC-Tax Accounts, with authorized signers Joele Smith and Randel Smith.  This account received at least $238,543.76 in transfers traceable to ADVANTAGE #1 through various accounts including The First #0820 [Asset A-024].

218.     Asset A-050: $122,613.25 seized from The First account number x0911, an account in the name of Ranjo Aviation, LLC, with authorized signers Joele Smith and Randel Smith.  This account received at least $1,367,000.00 in transfers traceable to ADVANTAGE #1 through various accounts including The First #0820 [Asset A-024].

219.     Asset A-051: $9,809.40 seized from The First account number x1795, an account in the name of Solas Marketing, LLC, with authorized signer Garrett Braley.  This account received at least $834,277.34 in transfers traceable to ADVANTAGE #1 through The First #1365 [Asset A-019].

220.     Asset A-052: $1,032,087.95 seized from Regions account number x9266, an account in the name of Performance Aviation, LLC, with authorized signer Wade Walters.  This account received at least $1,779,540.00 in transfers traceable to MEDWORX #2 and ADVANTAGE #1 through Regions #9401 [Asset A-025].

221.    Asset A-053: $37,507.72 seized from Regions account number x9361, an account in the name of Glenn Doyle Beach or Traci Beach, with authorized signers Glenn Doyle Beach and Traci Beach.  This account received at least $30,000.00 traceable to ADVANTAGE #1 through The First #1605 [Asset A-021].

222.    Asset A-054: $3,277.47 seized from Regions account number x5051, an account in the name of Glenn Doyle Beach or Traci Beach, with authorized signers Glenn Doyle Beach and Traci Beach.  This account received at least $117,800.00 in transfers traceable to ADVANTAGE #1 through Regions #8585 [Asset A-026].

223.    Asset A-055: $351,813.23 seized from Magnolia account number x1072, an account in the name of Walters Holdings, LLC, with authorized signers Jonathan McFadden, Chandler Smith, Dolly Walters, and Wade Walters.  This account received at least $7,159,970 in transfers traceable to MEDWORX #2 and ADVANTAGE #1 through The First #2454 [Asset A-002].

224.    Asset A-056: $504,951.72 seized from Priority account number x2814, an account in the name of Advantage Medical Infusion, LLC, doing business as AMI Rx, with authorized signers Glenn Doyle Beach and William Christopher Pierce.  This account received at least $242,783.73 in transfers from ADVANTAGE #1. This account also received at least $864,000.00 directly from TRICARE and $686,000 directly from Express Scripts.

225.    Asset A-057: $500.00 seized from Priority account number x3283, an account in the name of Development Industries Inc., with authorized signer Glenn Doyle Beach. This account received at least $50,000.00 in transfers from ADVANTAGE #1.

226.     Asset A-058: $361,373.81 seized from Bancorp account number x2178, an account in the name of JCM, LLC, with authorized signers Jason May and Kelsey May.  This account received at least $3,039,904.92 in transfers from ADVANTAGE #1.

227.     Asset A-059: $35,477.06 seized from Bancorp account number x4011, an account in the name of Jason or Kelsey May, with authorized signers Jason May and Kelsey May.  This account received at least $685,215.69 in transfers from ADVANTAGE #1.

228.     Asset A-060: $17,055.09 seized from NY Life IP number x5370, a policy in the name of Joele Smith.  This policy received at least $40,400.00 in transfers traceable to ADVANTAGE #1 through Citizens #2333 [Asset A-018].

229.     Asset A-061: $55,256.31 seized from NY Life IP number x4930, a policy in the name of Hope Thomley.  This policy received at least $163,000.00 in transfers traceable to ADVANTAGE #1 through The First #2685 [Asset A-020].

230.     Asset A-062:  $83,056.18 seized from NY Life IP number x4927, a policy in the name of Howard Randell Thomley.  This policy received at least $199,320.00 in transfers traceable to ADVANTAGE #1 through The First #2685 [Asset A-020].

231.     Asset A-063: $216,633.64 seized from NY Life IA x1513, an account in the name of IPMSI Holdings, LLC, Series B.  This policy received at least $249,234.60 in transfers traceable to ADVANTAGE #1 through NY Life IA #1512-1 [Asset A-036].

232.     Asset A-064: $253,495.66 seized from NY Life IA x1514, an account in the name of IPMSI Holdings, LLC, Series B.  This policy received at least $249,234.60 in transfers traceable to ADVANTAGE #1 through NY Life IA #1512-1 [Asset A-036] and various other accounts.

233.     Asset A-065: $347,975.52 seized from NY Life IA x1515, an account in the name of IPMSI Holdings, LLC, Series B.  This policy received at least $349,766.21 in transfers traceable to ADVANTAGE #1 through NY Life IA #1512-1 [Asset A-036] and various other accounts.

234.     Asset A-066: $548,136.28 seized from NY Life IA x1516, an account in the name of IPMSI Holdings, LLC, Series B.  This policy received at least $544,546.20 in transfers traceable to ADVANTAGE #1 through NY Life IA #1512-1 [Asset A-036] and various other accounts.

235.     Asset A-067: $129,933.17 seized from NY Life IA x1517, an account in the name of IPMSI Holdings, LLC, Series B.  This policy received at least $201,063.21 in transfers traceable to ADVANTAGE #1 through NY Life IA #1512-1 [Asset A-036] and various other accounts.

236.     Asset A-068: $504,585.94 seized from NY Life IA x1518, an account in the name of IPMSI Holdings, LLC, Series B.  This policy received at least $500,563.62 in transfers traceable to ADVANTAGE #1 through NY Life IA #1512-1 [Asset A-036] and various other accounts.

237.     Asset A-069: $86,924.42 seized from NY Life IA x1520, an account in the name of IPMSI Holdings, LLC, Series C.  This policy received at least $100,008.62 in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #1519-1 [Asset A-037] and various other accounts.

238.     Asset A-070: $252,455.59 seized from NY Life IA x1522, an account in the name of IPMSI Holdings, LLC, Series C.  This policy received at least $250,021.53 in transfers

traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #1519-1 [Asset A-037] and various other accounts.

239.    Asset A-071: $253,435.77 seized from NY Life IA x1523, an account in the name of IPMSI Holdings, LLC, Series C.  This policy received at least $250,021.53 in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #1519-1 [Asset A-037] and various other accounts.

240.    Asset A-072: $101,163.23 seized from NY Life IA x1524, an account in the name of IPMSI Holdings, LLC, Series C.  This policy received at least $100,008.61 in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #1519-1 [Asset A-037] and various other accounts.

241.    Asset A-073: $121,274.10 seized from NY Life IA x1525, an account in the name of IPMSI Holdings, LLC, Series C.  This policy received at least $120,502.18 in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #1519-1 [Asset A-037] and various accounts.

242.    Asset A-074: $452,194.46 seized from NY Life IA x1507, an account in the name of DWWW, LLC, with authorized signer Wade Walters.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life #1505 [Asset A-038].

243.    Asset A-075: $462,485.36 seized from NY Life IA x1508, an account in the name of DWWW, LLC, with authorized signer Wade Walters.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #1505 [Asset A-038].

244.    Asset A-076: $364,052.46 seized from NY Life IA x1509, an account in the name of DWWW, LLC, with authorized signer Wade Walters.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #1505 [Asset A-038].

245.    Asset A-077: $230,844.39 seized from NY Life IA x1510, an account in the name of DWWW, LLC, with authorized signer Wade Walters.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #1505 [Asset A-038].

246.    Asset A-078: $310,870.02 seized from NY Life IA x1511, an account in the name of DWWW, LLC, with authorized signer Wade Walters.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #1505 [Asset A-038].

247.    Asset A-079: $907,565.26 seized from NY Life IA x2522, an account in the name of Hope Thomley Holdings, LLC, with authorized signer Hope E. Thomley.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #2525 [Asset A-039].

248.    Asset A-080: $905,791.27 seized from NY Life IA x2523, an account in the name of Hope Thomley Holdings, LLC, with authorized signer Hope E. Thomley. This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #2525 [Asset A-039].

249.    Asset A-081: $521,925.05 seized from NY Life IA x2524, an account in the name of Hope Thomley Holdings, LLC, with authorized signer Hope E. Thomley. This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #2525 [Asset A-039].

250.    Asset A-082: $701,345.58 seized from NY Life IA x2521, an account in the name of Hope Thomley Holdings, LLC, with authorized signer Hope E. Thomley. This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #2525 [Asset A-039].

251.    Asset A-083: $701,673.89 seized from NY Life IA x2527, an account in the name of Howard Thomley Holdings, LLC, with authorized signer Howard "Randy" Thomley.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #2526 [Asset A-040].

252.    Asset A-084: $907,748.22 seized from NY Life IA x2528, an account in the name of Howard Thomley Holdings, LLC, with authorized signer Howard "Randy" Thomley.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #2526 [Asset A-040].

253.    Asset A-085: $905,851.68 seized from NY Life IA x2529, an account in the name of Howard Thomley Holdings, LLC, with authorized signer Howard "Randy" Thomley.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #2526 [Asset A-040].

254.    Asset A-086: $522,022.68 seized from NY Life IA x2530, an account in the name of Howard Thomley Holdings, LLC, with authorized signer Howard "Randy" Thomley.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #2521.

255.    Asset A-087: $5,404,475.92 seized from NY Life IA x4625, an account in the name of WW QP Holdings, LLC, with authorized signer Wade Walters.  This account received

at least $5,404,432.46 in transfers traceable to ADVANTAGE #1 and MEDWORX #2 through WFB #6960 [Asset A-031], 1st Source #6883 [Asset A-032], and various other accounts.

256.    Asset A-088: $98,373.56 seized from NY Life IA x4909, an account in the name of AF QP, LLC, with authorized signer Alison Frame.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #4902 [Asset A-041], Regions #4814, and various other accounts.

257.    Asset A-089: $154.91 seized from NY Life IA x4911, an account in the name of AF QP, LLC, with authorized signer Alison Frame.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #4902 [Asset A-041], Regions #4814, and various other accounts.

258.    Asset A-090: $96.59 seized from NY Life IA x4908, an account in the name of AF QP, LLC, with authorized signer Alison Frame.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #4902 [Asset A-041], Regions #4814, and various other accounts.

259.    Asset A-091: $335,549.69 seized from NY Life IA x4906, an account in the name of AF QP, LLC, with authorized signer Alison Frame.  This account was fully financed with funds traceable to ADVANTAGE #1 through NY Life IA #4902 [Asset A-041], Regions #4814, and various other accounts.

260.    Asset A-092: $167,711.21 seized from Brinker x9484, an account in the name of LILMAD Consulting, LLC Retirement Plan, with authorized signer Chandler Smith. This account received at least $297,642.25 in transfers traceable to ADVANTAGE #1 through Magnolia #1155 [Asset A-028].

70

261.     Asset A-093: $139,798.66 seized from Brinker x1231, an account in the name of Physique Pro, LLC, Retirement Plan, with authorized signer Joele Smith. This account received at least $ 147,100.00 in transfers traceable to ADVANTAGE #1 through Citizens #2333 [Asset A-018].

262.     Asset A-094: $504,008.03 seized from Brinker x1232, an account in the name of Physique Pro, LLC, Retirement Plan, with authorized signer Randel Smith.  This account received at least $529,850.00 in transfers traceable to ADVANTAGE #1 through Citizens #2333 [Asset A-018].

263.     Asset A-095: $301,613.10 seized from Brinker x7448, an account in the name of TLC RX, LLC Retirement Plan, with authorized signer Traci Beach.  This account received at least $314,874.70 in transfers traceable to ADVANTAGE #1 through Regions #8585 [Asset A-026].

264.     Asset A-096: $247,805.47 seized from Brinker x7079, an account in the name of TLC RX, LLC Retirement Plan, with authorized signer Glenn Doyle Beach.  This account received at least $258,864.72 in transfers traceable to ADVANTAGE #1 through Regions #8585 [Asset A-026].

265.     Asset A-097: $547,683.93 seized from Brinker x9499, an account in the name of UBV, LLC Retirement Plan, with authorized signer Hope E. Thomley.  This account received at least $377,180.00 in transfers traceable to ADVANTAGE #1 through The First #2685 [Asset A-020].

266.     Asset A-098: $796,876.48 seized from Brinker x9431, an account in the name of UBV, LLC Retirement Plan, with authorized signer Howard "Randy" Thomley.  This account

received at least $549,876.00 in transfers traceable to ADVANTAGE #1 through The First #2685 [Asset A-020].

267.    Asset A-099: $98,395.22 seized from NY Life IA x4884, an account in the name of HH QP, LLC, with authorized signer Hope Haws.  This account was fully financed with funds traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #4886 [Asset A-042], WFB #6960 [Asset A-031], Regions #4806, and various other accounts.

268.    Asset A-100: $260,629.03 seized from NY Life IA x4885, an account in the name of HH QP, LLC, with authorized signer Hope Haws.  This account was fully financed with funds traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #4886 [Asset A-042], WFB #6960 [Asset A-031], Regions #4806, and various other accounts.

269.    Asset A-101: $264,348.53 seized from NY Life IA x4883, an account in the name of HH QP, LLC, with authorized signer Hope Haws.  This account was fully financed with funds traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #4886 [Asset A-042], WFB #6960 [Asset A-031], Regions #4806, and various other accounts.

270.    Asset A-102: $335,340.14 seized from NY Life IA x4882, an account in the name of HH QP, LLC, with authorized signer Hope Haws.  This account was fully financed with funds traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #4886 [Asset A-042], WFB #6960 [Asset A-031], Regions #4806, and various other accounts.

271.    Asset A-103: $97,330.21 seized from NY Life IA x4912, an account in the name of TW QP, LLC, with authorized signer Trace Walters.  This account was fully financed with funds traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #4903 [Asset A-043], WFB #6960 [Asset A-031], Regions #4822, and various other accounts.

72

272.    Asset A-104: $124,422.79 seized from NY Life IA x4910, an account in the name of TW QP, LLC, with authorized signer Trace Walters.  This account was fully financed with funds traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #4903 [Asset A-043], WFB #6960 [Asset A-031], Regions #4822, and various other accounts.

273.    Asset A-105: $160,851.73 seized from NY Life IA x4913, an account in the name of TW QP, LLC, with authorized signer Trace Walters.  This account was fully financed with funds traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #4903 [Asset A-043], WFB #6960 [Asset A-031], Regions #4822, and various other accounts.

274.    Asset A-106: $250,094.30 seized from NY Life IA x4907, an account in the name of TW QP, LLC, with authorized signer Trace Walters.  This account was fully financed with funds traceable to ADVANTAGE #1 and MEDWORX #2 through NY Life IA #4903 [Asset A-043], WFB #6960 [Asset A-031], Regions #4822, and various other accounts.

<u>Real and Personal Property Funded by Advantage Pharmacy</u>

275.    Advantage also funneled fraud proceeds into personal property and real property, including the following assets:

276.    Asset B-016: Cirrus Design Corporation Aircraft Model SR22T, fixed-wing, single-engine aircraft, with tail number N729DW and serial number 0714, registered to Performance Aviation, LLC.  This aircraft was purchased with funds traceable to ADVANTAGE #1 through numerous accounts including Regions #9401 [Asset A-025].

277.    Asset B-017: $1,621,556 in United States Currency, derived from the sale of Learjet serial number 2071, registered to Ranjo Aviation, LLC.  This Learjet was purchased with the proceeds from the sale of Raytheon Aircraft Company Aircraft Model 390 tail number

N36866, serial number RB-166, also registered to Ranjo Aviation, LLC and $895,825 traceable to ADVANTAGE #1 through three other accounts.  The Raytheon aircraft was purchased with $1,975,537 traceable to ADVANTAGE #1 through two other accounts.  The $1,621,556 in United States Currency was voluntarily surrendered to the United States Marshal Service in June 2016 by Ranjo Aviation through their attorneys.

278.    Asset B-018: 2015 Mercedes Benz G550, VIN DYCYC3HFXFX233494, Tag MS 466S6, with all attachments thereon, registered to Hope E. Thomley or Randy Thomley.  This vehicle was purchased on February 17, 2015, with $73,533.90 traceable to ADVANTAGE #1 through The First #2685 [Asset A-020] and various other accounts.

279.    Asset B-019: 2014 Porsche Panamera, VIN WP0AA2A72EL010995, Tag MS 721S5, with all attachments thereon, registered to Hope E. Thomley or Randy Thomley. This vehicle was purchased on March 18, 2014, with $91,425.90 traceable to ADVANTAGE #1 through other accounts including The First #2685 [Asset A-020].

280.    Asset B-020: 2013 Ford F-150 Crew Cab, VIN 1FTFW1R6ODFC54655, Tag MS RAPTR32, with all attachments thereon, registered to United Business Ventures, LLC.  This vehicle was purchased on May 31, 2013, with $57,484 traceable to ADVANTAGE #1 through various accounts including The First #2685 [Asset A-020].

281.    Asset B-021:  2012 Ford F-150 Raptor, VIN 1FTFW1R60CFA22698 with all attachments thereon, registered to Randel Smith.  This vehicle was purchased on April 23, 2014, with $41,000 traceable to ADVANTAGE #1 through The First #1275 [Asset A-022].

282.    Asset B-022: 2010 Dodge Ram 2500, VIN 3D7UT2CL0AG108633 with all attachments thereon, registered to Randel Smith.  This vehicle was purchased on April 23, 2014, with $22,000 traceable to ADVANTAGE #1 through The First #1275 [Asset A-022].

283.    Asset B-023: 2014 Audi Q7, VIN WA1DGAFE0ED016621, Tag MS LMF 363, with all attachments thereon, registered to Glenn Doyle Beach.  This vehicle was purchased on April 7, 2014, with $33,965.25 traceable to ADVANTAGE #1 through Regions #8585 [Asset A-026].

284.    Asset B-024: 2013 Jeep Wrangler, VIN 1C4HJWEG8DL579557, Tag MS IMI 620, with all attachments thereon, registered to Glenn Doyle Beach, Jr.  This vehicle was purchased on October 1, 2014, with $38,501.95 traceable to ADVANTAGE #1 through Regions #8585 [Asset A-026].

285.    Asset B-025: 2012 Dodge Ram 2500, VIN 3C6UD5PL0CG199450 with all attachments thereon, registered to Glenn Doyle Beach doing business as N&P Farms, LLC.  This vehicle was purchased on May 19, 2014 with $53,125 traceable to ADVANTAGE #1 layered through other accounts including Priority #3176 [Asset A-030].

286.    Asset C-013: 650 Black Creek Road, Sumrall, Lamar County, Mississippi, further described in Attachment A, titled to Charles C. and Bonnie Smith.  This property was purchased with $318,000 traceable to ADVANTAGE #1 through six other accounts.  Additionally, at least $900,000 traceable to ADVANTAGE #1 was used to make improvements to the property.

287.    Asset C-014: 13 Cross Key Big Bay Lake (Lot 3), 29 Cross Key Big Bay Lake (Lot 7), and 33 Cross Key Big Bay Lake (Lot 8), Lamar County, Mississippi, further described in

Attachment A, all three parcels titled to Thomley Properties, LLC.  These parcels were purchased with $249,995.15 traceable to ADVANTAGE #1 through six other accounts.

288.    Asset C-015: Lot 3 of Pier Point, Big Bay Lake, Lamar County, MS, further described in Attachment A, titled to Thomley Properties, LLC.  This lot was purchased along with Asset C-016 with $299,418.80 traceable to ADVANTAGE #1 through six other accounts.

289.    Asset C-016: Lot 8 of Fisher Point Big Bay Lake, Lamar County, MS, further described in Attachment A, titled to Thomley Properties, LLC.  This lot was purchased along with Asset C-015 with $299,418.80 traceable to ADVANTAGE #1 through six other accounts.

290.    Asset C-017: Lot 5 Lure Line Big Bay Lake, Lot 16 Lure Line Big Bay Lake, and Lot 42 Lure Line Big Bay Lake, Lamar County, MS, further described in Attachment A, titled to Thomley Properties LLC.  These parcels were purchased with $450,308 traceable to ADVANTAGE #1 through six other accounts.

291.    Asset C-018: Parcel 055Q-22-031.001 (PPIN 036400), approximately 10 acres on Oak Grove Road, Hattiesburg, Lamar County, MS, further described in Attachment A, titled to Joele Smith.  This property was purchased with $191,508.33 traceable to ADVANTAGE #1 through two other accounts.

292.    Asset C-019: Parcel 101Q-12-053.001 (Bocage Ct.) Hattiesburg, Lamar County, MS, titled to Wade A. Walters, and Dorothy H. Walters.  This property was purchased with $548.00 traceable to ADVANTAGE #1 through Regions #0052 [Asset A-004] and The First #1365 [Asset A-019].

293.    Asset C-020: Parcels 103-06-001.002, 103-07-006.000, 103-07-006.001, 151-01-026.000, 151-01-027.000, 151-02-010.000, 151-12-001.000, located at North Black Creek Road,

76

Sumrall, Lamar County, MS, titled to Walters Holdings LLC.  The mortgage for this property was paid with $852,847.05 traceable to MEDWORX #2 and ADVANTAGE #1 through Magnolia #0072, Regions #3218, NY Life #3174, WFB #6960 [Asset A-031], Regions #0052 [Asset A-004], and The First #2685.

294.    Asset C-021: Parcel 103-07-010.000 located at North Black Creek Road, Sumrall, Lamar County, MS, titled to Walters Holdings LLC.  This property was purchased with $111,637.17 traceable to MEDWORX #2 and ADVANTAGE #1 through Magnolia #0072, Regions #3218, NY Life #3174, WFB #6960 [Asset A-031], Regions #0052 [Asset A-004], and The First #2685.

295.    Asset C-022: Parcel 103-06-003.002 (625 North Black Creek Rd.). This property was purchased with $12,710.00 traceable to MEDWORX #2 and ADVANTAGE #1 through Magnolia #0072, Regions #3218, NY Life #3174, WFB #6960 [Asset A-031],  Regions #0052 [Asset A-004], and The First #2685.

296.    Asset C-023: Parcels 054-26002, 054-26003, 054-26004, Tallahatchie County, MS, titled to DWWW, LLC and BPCK Nichols, LLC.  This property was purchased, in part, with $394,872.06 traceable to ADVANTAGE # 1 through Regions #9401 [Asset A-025].

297.    Asset C-024: 321 Steelman Road Hattiesburg, Lamar County, MS, titled to Randel L. Smith and Joele Smith.  The mortgage for this property was paid with $1,084,310.11 traceable to ADVANTAGE # 1 through The First #1275.

298.    Asset C-025: Lot 2, Ballantrae Subdivision, Lamar County, MS, titled to Randel L. Smith and Joele Smith. This property was purchased with $68,339.54 traceable to ADVANTAGE # 1 through The First #1275.

299.     Asset C-026: Lot 11, Big Bay Lake Community, Fisher Pointe Neighborhood, Lamar County, MS, titled to Ranjo Properties, LLC.  This property was purchased with $90,142.47 traceable to ADVANTAGE #1 through The First #0739 [Asset A-023], NY Life #3182, WFB #6960 [Asset A-031], and Citizens #2333 [Asset A-018].

300.     Asset C-027: 10 Cotton Tail Way W. (Lot 6 Briar Creek Subdivision), Purvis, Lamar County, MS. This property was purchased along with Asset C-028 and Asset C-029 with $1,069,940.38 traceable to ADVANTAGE # 1 through Citizens #2333 [Asset A-018].

301.     Asset C-028: 15 Tuscan Lane (Lot 4 Sienna Fields Subdivision, Parcel No. 105-15-026.005) and 19 Tuscan Lane (Lot 5 Sienna Fields Subdivision, Parcel No. 105-15-026.006), Sumrall, Lamar County MS.  This property was purchased along with Asset C-027 and Asset C-029 with $1,069,940.38 traceable to ADVANTAGE # 1 through Citizens #2333 [Asset A-018].

302.     Asset C-029: 120 Bellegrass Blvd. (Lot E-1 Bellegrass subdivision), Hattiesburg, Lamar County, MS, titled to Leaf River Investments, LLC.  This property was purchased along with Asset C-027 and Asset C-028 with $1,069,940.38 with $1,069,940.38 traceable to ADVANTAGE # 1 through Citizens #2333 [Asset A-018].

303.     Asset C-030: Lot 9, Big Bay Lake Community, Fisher Pointe Neighborhood, Lamar County, MS, titled to Ranjo Properties, LLC.  This property was purchased with $145,246.00 traceable to ADVANTAGE #1 through The First #0739 [Asset A-023], NY Life #3182, WFB #6960 [Asset A-031], The First #0820 [Asset A-024], and Citizens Bank #2333 [Asset A-018].

304.     Asset C-031: Lot D-2 (Parcel No. 1-050C-04-001.10) and Lot D-3 (Parcel No. 1-050C-04-001.02), Providence Subdivision, Forrest County, MS, titled to Joele Smith.   This

property was purchased (along with the property identified in the original complaint as (DD)) with $226,742.49 traceable to ADVANTAGE #1 through The First #0820 [Asset A-024].

305.    Asset C-032: Parcels. 1-005-04-019.04 and 1-005-03-028.00, Forrest County, MS, titled to Randel L. Smith and Joele Smith.  This property was improved with at least $312,492.21 traceable to ADVANTAGE #1 through Citizen #2333 [Asset A-018] and The First #1275.

306.    Asset C-033: Lots 6-26, 28-36, 40, and 41 of the Rabbit Run Subdivision, Tangipahoa Parish, LA, titled to Ranjo Louisiana Properties or Schillace Construction LLC. This property was purchased with $206,892.10 traceable to ADVANTAGE #1 through The First #0739 [Asset A-023], NY Life #3182, WFB #6960 [Asset A-031], The First #0820 [Asset A-024], and Citizens #2333 [Asset A-018].

307.    Asset C-034: Tract B of Block 25 in the Barber Addition, Hammond, Tangipahoa Parish, LA, titled to Ranjo Louisiana Properties.  This property was purchased with $211,278.34 traceable to ADVANTAGE # 1 through The First #0812 [Asset A-045], The First #0739 [Asset A-023], NY Life #3182, WFB #6960 [Asset A-031], The First #0820 [Asset A-024], and Citizens #2333 [Asset A-018].

308.    Asset C-035: 320 Grandmas Lane, (Lot 13 Ballard's Terrace Subdivision), Fayetteville, Fayette County, Georgia, titled to Ranjo Holdings.  This property was purchased with $380,419.87 traceable to ADVANTAGE # 1 through The First #0739 [Asset A-023], NY Life #3182, WFB #6960 [Asset A-031], The First #0820 [Asset A-024], and Citizens #2333 [Asset A-018].

309.    Asset C-036: 23 Deer Valley Dr. Hattiesburg, Lamar County, MS, titled to Howard Randy Thomley and Hope E. Thomley.  The mortgage for this property was paid with at least $275,400.84 traceable to ADVANTAGE #1 through The First #7760 [Asset A-044] and The First #2685.

310.    Asset C-037: 50 Hegwood Dr., Hattiesburg, Lamar County, MS, titled to Thomley's Christmas Tree Farm LLC.  This property was purchased with $475,658.91 traceable to ADVANTAGE #1 through NY Life #1910, WFB #6960 [Asset A-031], and The First #2865.

311.    Asset C-038: 197 Canebrake Blvd., Hattiesburg, Lamar County, MS, titled to Thomley Properties, LLC.  This property was purchased with at least $600,000 traceable to ADVANTAGE #1 through The First #1605 [Asset A-021], NY Life #1910, WFB #6960 [Asset A-031], The First #2685, and The First #2260.

312.    Asset C-039: 56 98 Place Blvd., Hattiesburg, Lamar County, MS, titled to Thomley Properties LLC.  This property was purchased with $209,882.56 traceable to ADVANTAGE # 1 through The First #1605 [Asset A-021], NY Life #1910, WFB #6960 [Asset A-031], The First #2685, and The First #2260.

313.    Asset C-040: 775 Gulf Shore Dr. #36, Destin, Okaloosa County, FL, titled to Howard, and Hope Thomley.  This property was purchased with $258,458.07 traceable to ADVANTAGE # 1 through The First #2685.

314.    Asset C-041: 775 Gulf Shore Dr. #9136, Destin, Okaloosa County, FL, titled to Thomley Properties, LLC.  This property was purchased with $252,135.02 traceable to ADVANTAGE # 1 through The First #1605 [Asset A-021], NY Life #1910, WFB #6960 [Asset A-031], and The First #2685.

315.     Asset C-042: 775 Gulf Shore Dr. #2154, Destin, Okaloosa County, FL, titled to Thomley Properties, LLC.  This property was purchased with $332,956.39 traceable to ADVANTAGE # 1 through The First #1605 [Asset A-021], NY Life #1910, WFB #6960 [Asset A-031], and The First #2685.

316.     Asset C-043: 775 Gulf Shore Dr. #2085, Destin, Okaloosa County, FL, titled to Thomley Properties, LLC.  This property was purchased with $185,971.28 traceable to ADVANTAGE # 1 through The First #1605 [Asset A-021], NY Life #1910, WFB #6960 [Asset A-031], and The First #2685.

317.     Asset C-044: 775 Gulf Shore Dr. #9104, Destin, Okaloosa County, FL, titled to Thomley Properties, LLC.  Property purchased with $258,097.47 traceable to ADVANTAGE # 1 through The First #1605 [Asset A-021], NY Life #1910, WFB #6960 [Asset A-031], The First #2685, and The First #2260.

318.     Asset C-045: Parcel 164-20-042.000 (Hwy. 44), Parcel 165-21-020.000 (Foster Rd.), Parcel 165-22-007.000 (JD Hatten Rd.), Parcel 165-22-023.000 (Foster Rd.), and Parcel 168-28-001.000 (Foster Rd.), Lamar County, MS, titled to Bone Forest LLC.  This property was purchased with $399,699.42 traceable to ADVANTAGE # 1 through The First #2538, The First #1605 [Asset A-021], NY Life #1910, WFB #6960 [Asset A-031], The First #2685, The First #2260, Priority #6328 [Asset A-029], and Regions #8585 [Asset A-026].

319.     Asset C-046: 47 Copper Creek, Hattiesburg, Lamar County, MS, titled to Brooke Braley.  This property was purchased with $221,557.87 traceable to ADVANTAGE # 1 through The First #2260, WFB #6960 [Asset A-031], and The First #2685.

320.    Asset C-047: 123 Higgins Rd. Sumrall, Lamar County, MS, titled to Glenn Doyle Beach Jr. and Traci Beach.  This property was purchased with at least $100,000.00 traceable to ADVANTAGE # 1 through Regions #8585 [Asset A-026].

**C.    Medworx**

321.    Medworx used two primary Source Accounts: Asset A-107, BankPlus account number x2033, an account in the name of Medworx Pharmacy, with authorized signers Tommy Spell and Herman Crowder (hereinafter MEDWORX #1); and Asset A-108, WFB account number x9266, an account in the name of Medworx Compounding, LLC, with authorized signers Tommy Spell and Herman Crowder (hereinafter MEDWORX #2).

322.    Medworx deposited payments from TRICARE, other federal health care programs, and private insurance companies as a result of claims submitted for prescriptions allegedly filled into MEDWORX #1.  Between July 2014 and January 2015, Medworx deposited at least $15,921,952.10 of TRICARE claim payments into MEDWORX #1.  MEDWORX #1 was also used to fund other accounts, which were used to pay kickbacks and to conceal the proceeds of illegal activity as they were disbursed to co-conspirators.

323.    Medworx deposited payments from TRICARE, other federal health care programs, and private insurance companies as a result of claims submitted for prescriptions allegedly filled into MEDWORX #2. Between January 29, 2015 and September 4, 2015, Medworx deposited at least $99,174,976.81 from TRICARE claim payments into MEDWORX #2.  MEDWORX #2 was also used to fund other accounts, which were used to pay kickbacks and to conceal the proceeds of illegal activity as they were disbursed to co-conspirators.

324.    $156,680.86 was ultimately seized from MEDWORX #1.  The remainder was dispersed through "pass-through" accounts to "recipient accounts" or used to purchase personal or real property.

325.    $2,350,868.18 was ultimately seized from MEDWORX #2.  The remainder was dispersed through "pass-through" accounts to "recipient accounts" or used to purchase personal or real property.  Funds often transferred through more than one pass-through account before being moved to a recipient account.

326.    A visual overview of the flow of proceeds through MEDWORX #1 and MEDWORX #2 follows:



84

327.    To facilitate the movement of the fraud proceeds, Medworx used the following financial institutions: Bancorp; NY Life IA; Regions; and WFB.

328.    Medworx used the following entities to transmit the fraud proceeds, often with the purpose of concealing the nature, source and origin of the proceeds: Arbors, LLC; Charitable Planning Consultants, LLC; DW QP Holdings, LLC; HH QP, LLC; Hooper Hollow Borrower, LLC; IPMSI Holdings, LLC Series J; Medworx Sunflower Series 1; Medworx Sunflower Series 2; Medworx Sunflower Series 3; Medworx Sunflower Series 4; Medworx Sunflower, LLC; Mississippi Group, LLC; North Mississippi Medworx Group, LLC; S&W Ventures, LLC; Salus Consulting and Management, LLC; Shaw Properties, LLC; Sunflower Discount Pharmacy, LLC; Thomas Spell, Jr. Irrevocable Trust; Thomas Spell, Jr. Irrevocable Trust for benefit of Thomas E Spell III; Thomas Spell, Jr. Irrevocable Trust for benefit of Tiffany Renee Spell; TW QP, LLC; and Wade and Dorothy Walters Irrevocable Trust.

329.    The following individuals were the recipients of the proceeds of the fraud scheme, or were otherwise nominee recipients: Brad Trussell; Dorothy (Dolly) Walters; Hope Haws; Jonathan McFadden; Stephen Mellinger, Jr; Tommy E. Spell, Jr; Trace Walters; Wade Walters.

330.    Because the conspirators involved in the scheme to defraud executed by the three pharmacies were involved together, their assets often commingled.  The below assets represent those which involved funds traceable to MEDWORX #1 and MEDWORX #2 as accounts where funds were commingled have previously been described above.

Medworx Pass-Through Accounts

331.    The following assets were seized from accounts that were used by Medworx as "pass-through accounts" to transfer funds and obfuscate the nature of the fraud proceeds:

332.    Asset A-109: $57,099.10 seized from Regions account number x2971, an account in the name of Medworx Sunflower Series 1, with authorized signers Wade Walters and Jonathan McFadden. This account received at least $94,181.93 in transfers from MEDWORX #2.  This account was used to fund other accounts.

333.    Asset A-110: $1,716,544.70 seized from WFB account number x4991, an account in the name of S&W Ventures, LLC, with authorized signers Robert M. McCauley Jr., Thomas E Spell, Jr., Dorothy H. Walters, Wade A. Walters, and Jonathan McFadden. This account received at least $18,711,557.77 from MEDWORX #1 and MEDWORX #2.  This account was used to fund other accounts.

334.    Asset A-111: $173,365.85 seized from WFB account number x0232, an account in the name of IPMSI Holdings, LLC Series J, with authorized signer Thomas Spell. This account received at least $1,000,000.00 in transfers traceable to MEDWORX #2 through Bancorp #8605 [Asset A-112] and Intellectual Property Management Services account at 1st Source #6883 [Asset A-032].  This account was used to fund other accounts.

335.    Asset A-112: $2,240.06 seized from Bancorp account number x8605, an account in the name of Salus Consulting and Management, LLC, with authorized signer Tommy E. Spell, Jr.  This account received at least $859,364.35 in transfers traceable to MEDWORX #1 through WFB #4991 [Asset A-110].  This account was used to fund other accounts.

336.    Asset A-113: $2,122,737.20 from Bancorp account number x9387, an account in the name of Tommy E. Spell, Jr., with authorized signer Tommy E. Spell, Jr. This account received at least $3,184,019.86 traceable to MEDWORX #1 and MEDWORX #2 through

Bancorp #8605 [Asset A-112], WFB #9120, and WFB #7094.This account was used to fund other accounts.

337.    Asset A-114: $980,007.22 seized from NY Life IA x4616, an account in the name of DW QP Holdings, LLC, with authorized signer Dorothy (Dolly) Walters. This account received at least $3,038,000.00 in transfers traceable to MEDWORX #2 through 1st Source #6883 [Asset A-032].  This was a "parent account" which was used to fund sub-accounts.

338.    Asset A-115: $600,149.16 seized from NY Life IA x1001, an account in the name of Thomas Spell, Jr. Irrevocable Trust, with authorized signer Stephen Mellinger, Jr. This account received at least $11,000,000.00 in transfers traceable to MEDWORX #2 through WFB #2132. This account was used to fund other accounts.

339.    Asset A-116: $0.27 seized from NY Life IA x4665, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Thomas E. Spell III, with authorized signer Stephen T. Mellinger, Jr.  This account received at least $1,000,000.00 in transfers traceable to MEDWORX #2 through NY Life IA #1001 [Asset A-115].  This account was a "parent account" that was used to fund sub-accounts.

340.    Asset A-147: $0.27 seized from NY Life IA x4671, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Tiffany Renee Spell, with authorized signer Stephen T. Mellinger, Jr.  This account received at least $1,000,000.00 in transfers traceable to MEDWORX #2 through NY Life IA #1001 [Asset A-115].  This account was a "parent account" that was used to fund sub-accounts.

341.    Asset A-117: $2.30 seized from NY Life IA x5215, an account in the name of Thomas Spell, Jr. Irrevocable Trust, with authorized signer Stephen T. Mellinger, Jr. This

account received at least $8,400.000.00 in transfers traceable to MEDWORX #2 through NY

Life IA #1001 [Asset A-115].  This account was a "parent account" that was used to fund sub-

accounts.

342.    Asset A-122: $853,590.37 seized from Regions account number x3528, an

account in the name of Sunflower Discount Pharmacy, LLC, with authorized signers Wade

Walters, Tommy Spell, and Jonathan McFadden.  This account received at least $112,682.43 in

transfers traceable to MEDWORX #2 through Regions #2971 [Asset A-109].

Medworx Recipient Accounts

343.    The following assets were seized from accounts that were used by Medworx as

"recipient accounts."  These accounts were the end point that collected fraud proceeds and were

used by the individuals involved in the fraud to enjoy the proceeds.

344.    Asset A-118: $28,019.83 seized from Regions account number x2963, an account

in the name of Medworx Sunflower Series 2, with authorized signers Wade Walters and

Jonathan McFadden.  This account received at least $60,706.24 in transfers from MEDWORX

#2.

345.    Asset A-119: $157,056.23 seized from Regions account number x3064, an

account in the name of Medworx Sunflower Series 3, with authorized signers Wade Walters and

Jonathan McFadden.  This account received at least $241,363.30 in transfers from MEDWORX

#2.

346.    Asset A-120: $17,684.90 seized from Regions account number x4180, an account

in the name of Medworx Sunflower Series 4, with authorized signers Wade Walters and

88

Jonathan McFadden.  This account received at least $234,799.65 in transfers from MEDWORX #2.

347.     Asset A-121: $39,920.64 seized from Regions account number x2998, an account in the name of North Mississippi Medworx Group, LLC, with authorized signers Wade Walters and Jonathan McFadden.  This account received at least $443,976.14 in transfers from MEDWORX #2.

348.     Asset A-123: $171,453.57 seized from Regions account number x3218, an account in the name of Medworx Sunflower, LLC, with authorized signers Wade Walters and Jonathan McFadden.  This account received at least $14,181,909.75 in transfers traceable to MEDWORX #2 through Regions #3528 [Asset A-122].

349.     Asset A-124: $50,024.14 seized from WFB account number x7373, an account in the name of IPMSI Holdings, LLC Series J, with authorized signer Thomas Spell. This account received at least $50,050.00 in transfers traceable to MEDWORX #2 through WFB #0232 [Asset A-111].

350.     Asset A-125: $123,443.70 seized from WFB account number x3864, an account in the name of Dolly Walters, with authorized signer Dolly Walters. This account received at least $744,472.35 in transfers traceable to MEDWORX #2 through WFB #4991 [Asset A-110].

351.     Asset A-126: $58,599.02 seized from NY Life IP number x2441, a policy in the name of Tommy Spell, Jr.  This account received at least $200,000.00 in transfers traceable to MEDWORX #2 through WFB #0232 [Asset A-111].

352.    Asset A-127: $318,070.42 seized from NY Life IA x4617, an account in the name of DW QP Holdings, LLC, with authorized signer Dorothy (Dolly) Walters. This account received funds traceable to MEDWORX #2 through NY Life IA #4616 [Asset A-114].

353.    Asset A-128: $2,019,931.50 seized from NY Life IA x4620, an account in the name of DW QP Holdings, LLC, with authorized signer Dorothy (Dolly) Walters. This account received funds traceable to MEDWORX #2 through NY Life IA #4616 [Asset A-114].

354.    Asset A-129: $1,002,312.90 seized from NY Life IA x4622, an account in the name of DW QP Holdings, LLC, with authorized signer Dorothy (Dolly) Walters. This account received funds traceable to MEDWORX #2 through NY Life IA #4616 [Asset A-114].

355.    Asset A-130: $318,423.72 seized from NY Life IA x4626, an account in the name of DW QP Holdings, LLC, with authorized signer Dorothy (Dolly) Walters. This account received funds traceable to MEDWORX #2 through NY Life IA #4616 [Asset A-114].

356.    Asset A-131: $741,896.85 seized from NY Life IA x4627, an account in the name of DW QP Holdings, LLC, with authorized signer Dorothy (Dolly) Walters.  This account received funds traceable to MEDWORX #2 through NY Life IA #4616 [Asset A-114].

357.    Asset A-132: $89,704.52 seized from NY Life IA x4666, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Thomas E Spell III, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4665 [Asset A-116].

358.    Asset A-133: $407,130.85 seized from NY Life IA x4667, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Thomas E Spell III, with authorized signer

Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4665 [Asset A-116].

359.     Asset A-134: $225,989.13 seized from NY Life IA x4668, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Thomas E Spell III, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4665 [Asset A-116].

360.     Asset A-135: $89,807.05 seized from NY Life IA x4669, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Thomas E Spell III, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4665 [Asset A-116].

361.     Asset A-136: $164,300.12 seized from NY Life IA x4670, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Thomas E Spell III, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4665 [Asset A-116].

362.     Asset A-137: $89,704.52 seized from NY Life IA x4673, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Tiffany Renee Spell, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4671 [Asset A-147].

363.     Asset A-148: $406,722.21 seized from NY LIFE IA x4674, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Tiffany Renee Spell, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4671 [Asset A-147].

364.    Asset A-138: $225,395.95 seized from NY LIFE IA x4675, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Tiffany Renee Spell, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4671 [Asset A-147].

365.    Asset A-139: $89,752.96 seized from NY LIFE IA x4677, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Tiffany Renee Spell, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4671 [Asset A-147].

366.    Asset A-140: $164,345.19 seized from NY Life IA x4678, an account in the name of Thomas Spell, Jr. Irrevocable Trust for benefit of Tiffany Renee Spell, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #4671 [Asset A-147].

367.    Asset A-141: $1,926,596.37 seized from NY Life IA x5217, an account in the name of Thomas Spell, Jr. Irrevocable Trust, with authorized signer Stephen T. Mellinger, Jr. This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #5215 [Asset A-117].

368.    Asset A-142: $639,247.64 seized from NY Life IA x5218, an account in the name of Thomas Spell, Jr. Irrevocable Trust, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #5215 [Asset A-117].

369.    Asset A-143: $640,682.61 seized from NY Life IA x5219, an account in the name of Thomas Spell, Jr. Irrevocable Trust, with authorized signer Stephen T. Mellinger, Jr.  This

account received funds in transfers traceable to MEDWORX #2 through NY Life IA #5215 [Asset A-117].

370. Asset A-144: $1,438,694.53 seized from NY Life IA x5220, an account in the name of Thomas Spell, Jr. Irrevocable Trust, with authorized signer Stephen T. Mellinger, Jr. This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #5215 [Asset A-117].

371. Asset A-145: $1,438,514.12 seized from NY Life IA x5221, an account in the name of Thomas Spell, Jr. Irrevocable Trust, with authorized signer Stephen T. Mellinger, Jr. This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #5215 [Asset A-117].

372. Asset A-146: $315,341.68 seized from NY Life IA x5222, an account in the name of Thomas Spell, Jr. Irrevocable Trust, with authorized signer Stephen T. Mellinger, Jr.  This account was fully financed with funds traceable to MEDWORX #2 through NY Life IA #5215 [Asset A-117].

Real and Personal Property Funded by Medworx

373. Medworx also funneled fraud proceeds into personal property and real property, including the following assets:

374. Asset B-026: Promissory Note dated July 8, 2015 for $2,200,000 payable to IPMSI Holdings, LLC, Series J from Shaw Properties, LLC.  This note has a maturity date of July 8, 2017 and was settled by Stewart and Guaranty by and through its authorized Mississippi Agent, Mississippi Group, LLC.  This note was purchased with proceeds traceable to MEDWORX #2.

375.     Asset B-027: $2,950,018.00 in United States Currency, derived from the proceeds of a promissory note dated July 8, 2015 for $2,800,000 payable to IPMSI Holdings, LLC, Series J and issued by Hooper Hollow Borrower, LLC.  This note was purchased with proceeds traceable to MEDWORX #2. Upon seizure of the note by the United States, Hooper Hollow Borrower, LLC paid the balance of the debt and deposited the funds into an account managed by the United States.

376.     Asset B-028: 2015 Mercedes Benz GLK350, VIN WDCGG5HB2FG423010, Tag MS 01819, with all attachments thereon, registered to Tommy Spell.  This vehicle was purchased on July 2, 2015 with $47,037.15 traceable to MEDWORX #2 layered through other accounts including Bancorp #9387 [Asset A-113].

377.     Asset B-029: Promissory Note dated October 9, 2015, for $3,100,000 payable to IPMSI HOLDINGS, LLC, SERIES J, from Arbors, LLC. This note has a maturity date of December 31, 2018, and was settled by Stewart and Guaranty by and through its authorized Mississippi Agent, Mississippi Group, LLC. This note was purchased with $3,100,000 traceable to MEDWORX #2 through WFB #0232 [Asset A-111].

378.     Asset B-030: 2014 Jeep Wrangler Rubicon, VIN 1C4HJWFGXEL101995, with all attachments thereon, registered to Tommy Spell. This vehicle was purchased on May 22, 2015 and was financed through Regions loan #0703. The loan was subsequently paid with $47,671.61 traceable to MEDWORX #2 through Bancorp #9387 and WFB #9120.

379.     Asset C-048: 532 Farmside Lane, Unit #14, Walland, Blount County, Tennessee, further described in Attachment A, titled to Brad Trussell, Trustee for the Wade and Dorothy

Walters Irrevocable Trust.  This parcel was purchased for approximately $3,020,881.81 of which at least $2,226,432.01 were traceable to MEDWORX #2 through three other accounts.

380.    Asset C-049:  Parcel 082-063.06 (17.65 Acres) on Wolf Creek Road, Walland, Blount County, Tennessee, further described in Attachment A, titled to Brad Trussell, Trustee for the Wade and Dorothy Walters Irrevocable Trust.  This parcel was purchased with $397,325.68 traceable to MEDWORX #2 through two other accounts.

381.    Asset C-050: 19 Crane Park, Hattiesburg, Lamar County, MS, titled to Wade A. Walters and Dorothy H.  Walters.  The mortgage on this property was entirely paid for with $208,451.47 traceable to MEDWORX #2 through Regions #8418 [Asset A-008] and WFB #9120.

382.    Asset C-051: Parcel 088-19003, Tallahatchie County, MS titled to TWQP, LLC. This property was purchased with $329,874.64 traceable to MEDWORX #2 through Regions #4822, WFB #6960, Regions #9629 [Asset A-149], Magnolia #1072, The First #2454 [Asset A-002], and Regions #3218.

383.    Asset C-052: 550 Post Rd. #25-5, Ridgeland, Madison County, MS, titled to Thomas E. Spell Jr. This property was purchased with $211,244.94 traceable to MEDWORX # 1 through Bancorp #9387 [Asset A-113], Bancorp #5097, Copiah Bank #4757, and WFB #4991 [Asset A-110].

384.    Asset C-053: 800 College Hill Rd. Apt. 2302, Oxford, Lafayette County, MS, titled to IPMSI Holdings Series J, LLC. This property was purchased with $366,550.00 traceable to MEDWORX # 1 through WFB #0232 [Asset A-111], 1st Source #6883 [Asset A-032], Bancorp #8605 [Asset A-112], and WFB #4991 [Asset A-110].

95

385.    Asset C-054: 43 Sandy Creek Circle, Santa Rosa Beach, Walton County, FL, titled to Charitable Planning Consultants, LLC, Trustee of the Thomas E. Spell Jr. Irrevocable Trust. This property was purchased with $1,393,393.51 traceable to MEDWORX #2 through WFB #7094, WFB #2132, 1st Source #6883 [Asset A-032], and Regions #3218.

## CLAIMS FOR RELIEF

First Claim for Relief
18 U.S.C. §§ 981(a)(1)(C) and 984
(Proceeds of Wire Fraud)

386.    Paragraphs 1 through 385 of this First Amended Complaint are incorporated herein by reference.

387.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . or any offense constituting specified unlawful activity" or "a conspiracy to commit such offense" is subject to forfeiture by the United States.

388.    "Specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(A), and 1961(1)(B) to include, among other things, offenses in violation of 18 U.S.C. § 1343 (wire fraud).

389.    For purposes of the civil forfeiture statutes and pursuant to 18 U.S.C. § 981(a)(2)(A), "proceeds" refers to "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from this offense."

390.    Each of the defendants *in rem* are property that constitutes and is derived from proceeds traceable to specified unlawful activity, specifically a scheme to commit wire fraud or a

conspiracy to commit wire fraud.  As a result, the *in rem* defendants are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C).

Second Claim for Relief
18 U.S.C. §§ 981(a)(1)(C) and 984
(Proceeds of Conspiracy to Commit Wire Fraud)

391.    Paragraphs 1 through 390 of this First Amended Complaint are incorporated herein by reference.

392.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . or any offense constituting specified unlawful activity" or "a conspiracy to commit such offense" is subject to forfeiture by the United States.

393.    "Specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(F) to include any act or activity constituting an offense involving a Federal health care offense.  Federal health care offense is defined in 18 U.S.C. § 24 as, among other things, a violation of 18 U.S.C. § 1349 (conspiracy to commit wire fraud).

394.    For purposes of the civil forfeiture statutes and pursuant to 18 U.S.C. § 981(a)(2)(A), "proceeds" refers to "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from this offense."

395.    Each of the defendants *in rem* are property that constitutes and is derived from proceeds traceable to specified unlawful activity, specifically a scheme to commit wire fraud or a conspiracy to commit wire fraud.  As a result, the *in rem* defendants are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C).

97

Third Claim for Relief
18 U.S.C. §§ 981(a)(1)(C) and 984
(Proceeds of Federal Health Care Fraud or Health Care Fraud Conspiracy)

396.    Paragraphs 1 through 395 of this First Amended Complaint are incorporated herein by reference.

397.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . or any offense constituting specified unlawful activity" or "a conspiracy to commit such offense" is subject to forfeiture by the United States.

398.    "Specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(F) to include any act or activity constituting an offense involving a Federal health care offense.  Federal health care offense is defined in 18 U.S.C. § 24 as, among other things, a violation of 18 U.S.C. § 1347 (health care fraud).

399.    For purposes of the civil forfeiture statutes and pursuant to 18 U.S.C. § 981(a)(2)(A), "proceeds" refers to "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from this offense."

400.    Each of the defendants *in rem* are property that constitutes and is derived from proceeds traceable to specified unlawful activity, specifically a scheme to commit wire fraud or a conspiracy to commit wire fraud.  As a result, the *in rem* defendants are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C).

Fourth Claim for Relief
18 U.S.C. §§ 981(a)(1)(C) and 984
(Proceeds of Federal Health Care Offense or Conspiracy to Commit Such Offense)

401.    Paragraphs 1 through 400 of this First Amended Complaint are incorporated
herein by reference.

402.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which
constitutes or is derived from proceeds traceable to a violation of . . . or any offense constituting
specified unlawful activity" or "a conspiracy to commit such offense" is subject to forfeiture by
the United States.

403.    "Specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7)(F) to include
any act or activity constituting an offense involving a Federal health care offense.  Federal health
care offense is defined in 18 U.S.C. § 24 as, among other things, a violation of section 1128B of
the Social Security Act (42 U.S.C. 1320a–7b).

404.    For purposes of the civil forfeiture statutes and pursuant to 18 U.S.C.
§ 981(a)(2)(A), "proceeds" refers to "property of any kind obtained directly or indirectly, as a
result of the commission of the offense giving rise to forfeiture, and any property traceable
thereto, and is not limited to the net gain or profit realized from this offense."

405.    Each of the defendants *in rem* are property that constitutes and is derived from
proceeds traceable to specified unlawful activity, specifically a scheme to commit wire fraud or a
conspiracy to commit wire fraud.  As a result, the *in rem* defendants are subject to forfeiture to
the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C).

99

Fifth Claim for Relief
18 U.S.C. §§ 981(a)(1)(A) and 984
(Property Involved in Concealment Money Laundering, 18 U.S.C. § 1956)

406.    Paragraphs 1 through 405 of this First Amended Complaint are incorporated herein by reference.

407.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 … or any property traceable to such property" is subject to forfeiture by the United States.  18 US.C. § 1956(a)(1)(B)(i) prohibits a person from knowingly engaging or attempting to engage in a monetary transaction of property derived from a specified unlawful activity, with the intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity. 18 U.S.C. § 1956(h) prohibits any conspiracy to violate 18 U.S.C. § 1956.

408.    As noted above, wire fraud (18 U.S.C. § 1343) and federal health care offenses conspiracy to commit wire fraud (18 U.S.C. § 1349), health care fraud (18 U.S.C. § 1347), and 42 U.S.C. 1320a–7b are all included in the definition of "specified unlawful activity".

409.    Each of the defendants *in rem* are property that is involved in a violation of 18 U.S.C. § 1956 or is property traceable to such violation.  As a result, the *in rem* defendants are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(A).

Sixth Claim for Relief
18 U.S.C. §§ 981(a)(1)(A) and 984
(Property Involved in Promotion Money Laundering, 18 U.S.C. § 1956)

410.    Paragraphs 1 through 409 of this First Amended Complaint are incorporated herein by reference.

100

411.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 … or any property traceable to such property" is subject to forfeiture by the United States.  18 US.C. § 1956(a)(1)(A)(i) prohibits a person from knowingly engaging or attempting to engage in a monetary transaction of property derived from a specified unlawful activity, with the intent to promote the carrying on of a specified unlawful activity.  18 U.S.C. § 1956(h) prohibits any conspiracy to violate 18 U.S.C. § 1956.

412.    As noted above, wire fraud (18 U.S.C. § 1343) and federal health care offenses conspiracy to commit wire fraud (18 U.S.C. § 1349), health care fraud (18 U.S.C. § 1347), and 42 U.S.C. 1320a–7b are all included in the definition of "specified unlawful activity".

413.    Each of the defendants *in rem* are property that is involved in a violation of 18 U.S.C. § 1956 or is property traceable to such violation.  As a result, the *in rem* defendants are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(A).

Seventh Claim for Relief
18 U.S.C. §§ 981(a)(1)(A) and 984
(Property Involved in Money Laundering, 18 U.S.C. § 1957)

414.    Paragraphs 1 through 413of this First Amended Complaint are incorporated herein by reference.

415.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section…1957… or any property traceable to such property" is subject to forfeiture by the United States.  18 U.S.C. § 1957(a) prohibits a person from knowingly engaging or attempting to engage in a monetary transaction in

101

criminally derived property that has a value greater than $10,000 and is derived from a specified unlawful activity. 18 U.S.C. § 1956(h) prohibits any conspiracy to violate 18 U.S.C. § 1957.

416.    As noted above, wire fraud (18 U.S.C. § 1343) and federal health care offenses conspiracy to commit wire fraud (18 U.S.C. § 1349) health care fraud (18 U.S.C. § 1347), and 42 U.S.C. 1320a–7b are all included in the definition of "specified unlawful activity".

417.    Each of the defendants *in rem* are property that is involved in a violation of 18 U.S.C. § 1956 or is property traceable to such violation.  As a result, the *in rem* defendants are subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Defendant Property be forfeited to the United States, that due process issue for seizure and forfeiture of the Defendant Property, that this Court issue a warrant for the arrest of the Defendant Property, that all persons having an interest therein be cited to appear herein and show cause why forfeiture should not be decreed, that notice of this action be given to all persons known or thought to have an interest in or right against the property, that a judgment be entered declaring that the Defendant Property be condemned as forfeited to the United States for disposition in accordance with law, that the United States be

awarded its costs and disbursements in this action, and for such other and further relief as the Court

deems just and proper.

Dated this the 10th day of February, 2017.

Respectfully Submitted,

UNITED STATES OF AMERICA            M. KENDALL DAY, CHIEF
GREGORY K.  DAVIS                   Money Laundering and
United States Attorney              Asset Recovery Section


By:  *Marc A. Perez*          By:  *Marc A. Perez*
                                   *for*
     MARC A. PEREZ                  PAMELA J. HICKS
     WA Bar No. 33907               DC Bar No. 442060
     Assistant United States Attorney   Chief, Money Laundering
     501 East Court Street, Suite 4.430    and Forfeiture Unit
     Jackson, Mississippi 39201     SEAN WELSH
     Phone:    (601) 973-2820       VA Bar No. 89660
     Fax:      (601) 965-4409       Trial Attorney,
     E-mail:   Marc.Perez@usdoj.gov   Money Laundering and
                                       Asset Recovery Section
                                    Criminal Division
                                    U.S. Department of Justice
                                    1400 New York Ave.
                                    Washington, D.C. 20530
                                    Phone:    (202) 514-1263
                                    Fax:      (202) 514-5522
                                    Email:    Pamela.Hicks@usdoj.gov
                                    Email:    Sean.Welsh@usdoj.gov

103

## **VERIFICATION**

I, DARREN M. MAYER, hereby verify and declare under penalty of perjury that I am a Special Agent of the Internal Revenue Service and that I have read the foregoing First Amended Complaint for forfeiture in *rem* and know the contents thereof, and that the matters contained in the First Amended Complaint are true to the best of my knowledge, information and belief. The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

DARREN M. MAYER, SPECIAL AGENT
Internal Revenue Service