UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
CIVIL ACTION No. 3:16-cv-00027 TSL-RHW

United States of America,

    Plaintiff

v.

Real Property Located at 19 Crane
Park, Hattiesburg, Lamar County, Mississippi
With all Appurtenances, Improvements, and
Fixtures Thereon, et al.,

    Defendants
_____/

**CLAIMANT HOPE THOMLEY'S MEMORANDUM IN SUPPORT OF MOTION TO LIFT STAY, DISMISS AMENDED COMPLAINT, AND FOR RELEASE OF FUNDS**

    For two years, the Government has seized and restrained virtually all of Hope Thomley's assets. The Government requested and obtained a stay of indefinite length on the basis of its purportedly ongoing criminal investigation. The stay has endured for over one year and four months, and is climbing. The threatened investigation has neither resulted in an indictment of Hope, nor has the Government indicated to her that its investigation is closed. All the while, the Government has restrained millions of dollars of her assets, with no opportunity for her to challenge the Government's allegations. Accordingly, Hope files her Motion and this Memorandum of Law in Support of her request to:

    1. Lift the indefinite stay;

    2. Dismiss the Amended Complaint with prejudice and release Hope's assets for violation of her right to due process because of the Government's pretrial delay;

3. Alternatively if the Court does not conclude that a due process violation warranting dismissal has occurred, to release:

(A) pension plan assets protected by the Employment Retirement Income Security Act of 1974's (ERISA) anti-alienation provision and

(B) additionally to release funds necessary to implement Hope Thomley's Right to Counsel.

I.  **Who Hope Thomley Is**

The Government believes Hope Thomley is a bad and greedy person with millions of dollars in dirty money. It could not possibly be more wrong about her.

Hope is a wife, mother, and grandmother. A former healthcare executive, Hope is a self-made woman who has worked hard and worked honestly for everything that she has.



*Hope Thomley, husband Randy, and one of their granddaughters - Alice.*

Hope and her husband Howard "Randy" Thomley have been married for eight years. Theirs is a blended family - both Hope and Randy each have three adult children from their prior marriages. Hope's youngest son played baseball at Southern Mississippi (Hope never missed a

game in his entire college career for the Golden Eagles) and was recently drafted as a pitcher by the Miami Marlins organization. Her daughter works for Prudential Insurance in Jackson. Hope's oldest son is now a youth pastor – he and his wife are also new parents of twin boys. Randy's youngest son is a bright young man with Asperger syndrome who attends Southern Mississippi. His daughter lives in Manhattan. A teacher by training, she works as a nanny. Randy's oldest son is a glassblower, welder, and artist – his art focuses often on themes of 'breath' and 'air,' and draws heavily from his personal health experience living with cystic fibrosis. Hope and Randy have six grandchildren, ranging in age from four months to six years old.

From the time she was a toddler until she was a young teenager, Hope was raised by her grandmother in rural Mississippi, about 40 miles outside Hattiesburg. This was an extremely modest upbringing – the home Hope was raised in lacked indoor plumbing.

When Hope was 14, her grandmother fell ill, and Hope moved to Hattiesburg to live with her mother and stepfather (Hope's parents divorced when she was born, and she never met her biological father). That was also when Hope got her first job, so that she could afford to buy clothes. Hope worked at Waldoff's – a small department store – during the week and at a donut shop on Saturday and Sunday mornings.

Working and studying hard, Hope earned admission to the University of Southern Mississippi. There, she met and married her first husband, who played football for the Golden Eagles. The couple had two of their three children while attending Southern. It was a busy time for the family and Hope in particular. With her husband not able to work full time due to the constraints of his football scholarship, Hope was the family's sole wage earner, in addition to being a young mother and a college student.

Hope graduated Southern with a degree in marketing with an emphasis on sales management and also studied accounting. Out of college, she started working for a trucking company and handled all of its accounting work. Hope and her husband saved to buy three eighteen wheelers, which they leased to the trucking company.

In 1997, Hope went to work for the Southeast Mississippi Rural Health Initiative – a non-profit organization established to improve the health of residents in predominantly rural areas of southeast Mississippi. Its focus was (and is) on serving the uninsured and the underinsured. There she discovered her passion for the healthcare field, to which she has devoted her professional life since.

When Hope was hired at Southeast Mississippi Rural Health to do accounting work, the organization had three clinics. In her later tenure as CFO (for twelve years) and CEO (for three years), Hope led the expansion of Southeast Mississippi Rural Health to thirty-three health clinics (including an obstetrics clinics and a dental clinic), as well as a "closed door" pharmacy – one that served only Southeast Mississippi Rural Health patients and offered medication at a reduced price in order to improve community access. Hope was hands-on in her tenure at Southeast Mississippi Rural Health and deeply involved in every aspect of its operation – down to even developing architectural designs for some of the clinics opened during her time with the organization. **Exhibit 1** to this Motion is an article from the Hattiesburg American discussing Hope's selection as CEO and some of her work as CFO.

Following her tenure with Southeast Mississippi Rural Health (which ended in 2011), Hope worked in healthcare consulting. In her consulting work, she focused on the many of the same aspects of healthcare administration that she had at Southeast Mississippi Rural Health, but now from the hospital perspective. Hope subsequently became involved in the compounding pharmacy

space. Her husband Randy is a longtime New York Life agent who started working with Hope on healthcare matters in 2014.

## II. The Government's Restraint of Virtually All of Hope Thomley's Assets

Compounding pharmacies are legitimate businesses that serve important patient needs. Compounded medications offer the advantage of turning medications into forms that are more effective for patients or which avoid problems associated with mass-produced medication. For example, pain medications compounded in the form of a cream are far less addictive than mass-produced opioid pills, and their use is a meaningful tool to help curb the present opioid abuse epidemic in our country.

Government payors reimbursed compounded medications based on the ingredients included. The government now has a case of buyer's remorse – having paid compounding pharmacies as it did, based on a system of the government's own devising, the government now believes it paid too much. This has led to the government viewing compounding pharmacies with suspicion, criticizing their business practices, and opening multitudes of investigations across the country.

The Government has seized virtually all of Hope's assets – as well as her husband Randy's assets[1] – on the basis of such suspicions. It seized bank accounts. It seized retirement plan assets. It encumbered real estate, including the Christmas tree farm that the Thomley's bought from Randy's parents (who had owned the Christmas tree farm since 1967).[2]

---

[1] For further details, *see* [DE 21] through [DE 24], Verified Claims by Hope Thomley, Thomley Properties LLC, United Business Ventures LLC, and Thomley's Christmas Tree Farm. Randy Thomley's Verified Claim is [D.E. 26]. Because the Government amended its complaint during the period of the stay to add the seized financial accounts and personal property, Hope has not yet had the opportunity to assert a claim with respect to the seized financial accounts and personal property. She will identify the relevant assets promptly.

[2] The Government proceeded by encumbering real property with lis pendens at the time of its initial sealed complaint. The Government obtained seizure warrants enabling it to seize the personal property (including financial accounts) subject to this case, with some of those seizures being more or less contemporaneous with the filing of the sealed

The Government effectuated its cash grab in early 2016 through the use of seizure warrants. The Government contemporaneously executed search warrants, including on Hope's office where the Government took even the family photos on her desk.

The Government filed this case on January 20, 2016, and moved for a stay on September 1, 2016. In the Government's initial wave of shock and awe and with the expectation that the Government's criminal investigation would proceed at a reasonable pace, Hope did not oppose the Government's request. The Government's basis for a stay was the assertion that participating in civil discovery would adversely affect its ability to conduct its related criminal investigation. *See* [D.E. 146]. The Court granted the Government's Motion on October 12, 2016, stating, "all proceedings, with the exception of motions for interlocutory sale, are hereby stayed. The stay covers proceedings related to two [then] currently pending motions to dismiss." [D.E. 162] at 1-2.[3]

Over two years after this case was filed and over a year and four months since the Government moved for a stay, the Government has still not charged Hope with any crime – nor has the Government closed its investigation. It has kept Hope in limbo, with virtually all of her assets restrained and with criminal accusations threatened.

### III. The Indefinite Stay – Lasting One Year, Four Months, and Climbing – Has Outlived Any Legitimate Justification and Violates Due Process

The Government has taken unfair advantage of the indefinite stay, and in doing so violates Ms. Thomley's Constitutional rights. Freed the prospect of discovery and responding to substantive motions, the Government seems to have dragged its heels. It has neither charged Hope with a crime,

---

original complaint, and others coming in March and May 2016. When the Government amended its complaint on February 10, 2017, it added this property.

[3] Subsequently, on Claimant Thomas Spell's Motion for Reconsideration, the Court ordered the Government to submit an *ex parte* brief regarding whether discovery related to Mr. Spell's Motion to Dismiss would negatively impact the Government's investigation. [D.E. 172]. However, Mr. Spell then agreed that the Government's Amended Complaint would moot his objections and stipulated to the stay. [D.E. 178].

nor told her that its investigation as to her is closed. Discovery has not been able to proceed, and thus this case is not close to a posture where a case-dispositive summary judgment motion could be filed or where this case could be resolved on the merits at trial.

The Government has used the indefinite stay to achieve a perverse result, wielding the forfeiture stay provision, 18 U.S.C. § 981(g)(1), as both a sword and shield. It seized virtually all of Ms. Thomley's assets (and her husband Randy's assets) on the basis of seizure warrants obtained *ex parte*, necessarily leaving her with no ability to argue probable cause before the government wrested control of her property, and the stay has prevented her from vindicating herself in this proceeding.

The indefinite stay has now long outlived any legitimate purpose. Early on, government ran a bait-and-switch: it used the sometimes appropriate mechanism of 18 U.S.C. § 981(g)(1) to obtain Hope's concession to not oppose the stay motion. At that time, Hope believed the Government would advance its investigation (or this case) in a reasonable time period. Having obtained that agreement, the government has gone a lengthy period (more than two years since filing this case) without bringing this matter or its investigation to a conclusion.

The Government has largely treated the stay as one-sided. It took advantage of the stay to formulate and file its Amended Complaint [D.E. 183] in February 2017. It stands 100 pages longer than the Government's original Complaint. *Compare* [D.E. 1]. There have been a total of sixty-four docket entries since the entry of the stay order. While some of these docket entries have been ministerial, many have been substantive. The Government has moved to substitute property. *See e.g*. [D.E. 199] (Government's motion to substitute claimant Thomas Spell's in an entity for a $3,100,000 promissory note) and [D.E. 211] (Government's motion to substitute a modified promissory note, including a provision that the Government states that it "insisted" on, that payments on the note be paid to an account designated by the Government). It has sought to sell seized property. [D.E. 202] (Agreement to sell real estate which gave Government "sole discretion to allow or forbid the sale for any reason") and [D.E. 203] (Agreement to sell an airplane, likewise allowing the Government "sole

7

discretion to allow or forbid the sale for any reason"). The Government has also moved to release property in connection with the settlement of a separate lawsuit, [D.E. 206], and has settled with a party [D.E. 219]. It seems the Government believes the status quo should be maintained when it suits the Government, but that claimants should be denied the opportunity to challenge the seizure of their assets.

The law disfavors indefinite stays such as this one because of the risk they pose to Constitutional rights. *See e.g. McKnight v. Blanchard*, 667 F.2d 477 (5th Cir. 1982) ("stay orders will be reversed when they are found to be immoderate or of an indefinite duration."); (United States v. $307,970 in U.S. Currency*, 156 F. Supp. 3d 708 (E.D.N.C. 2016) (rejecting the Government's request for a stay until the conclusion of related criminal proceedings, instead requiring a limited time period). The risk posed by this stay is acute because it is totally open-ended it, limited by neither the passage of time nor the occurrence of any other event.

The Government's approach to date – paralyzing the assets of Ms. Thomley for two years based on the threat of a criminal prosecution which has still not materialized, all while never affording her no means to challenge the seizure, offends American ideals of justice and fair play and – more concretely – her due process rights. The indefinite stay entered in this case should be lifted.

**IV.    The Government's Pretrial Delay Violates Due Process Warranting Dismissal of Its Amended Complaint**

The delay created by the Government violates due process. Courts apply the *Barker v. Wingo,* 407 U.S. 514 (1972) speedy trial analysis in the context of due process challenges to forfeiture proceedings. The specific concern raised by the government's inaction in a forfeiture case "mirrors the concern of undue delay encompassed in the right to a speedy trial." *United States v. $8,850 in U.S. Currency*, 461 U.S. 555, 564 (1983).  The *Barker* test weighs four factors: the length of delay, the government's reason for delay, movant's assertions of her or his rights, and prejudice to the movant. *Id.*. This is a balancing test based on the particular facts of each case – no factor is a necessary element

for finding that a due process violation occurred. *Id.* at 565. Rather, the factors are a guide to balancing the interests of a claimant and the government to determine whether a due process violation has occurred. *Id.*

In *$8,850 in U.S. Currency*, the Supreme Court held that "[t]he flexible approach of *Barker*" was the appropriate test for determining whether the Government's post-seizure delay in filing a forfeiture suit violated due process. *Id.* at 565; *see also e.g. United States v. $23,407.69 in U.S. Currency*, 715 F.2d 162 (5th Cir. 1983) (applying *$8,850* and affirming finding that government's thirteen month delay in filing forfeiture suit was unconstitutional).

Courts have since applied the approach articulated by *$8,850* in the context of analyzing due process violations caused by the Government's pretrial delay in filed forfeiture cases. *See e.g. United States v. $307,970 in U.S. Currency*, 156 F. Supp. 3d 708, 716 (E.D.N.C. 2016) ("[T]he 'flexible' due process principles articulated by the Court [in *$8,850*] easily are expanded to cover situations in which the government unfairly delays a case from coming to trial."); *United States v. $12,248 U.S. Currency,* 957 F.2d 1513 (9th Cir. 1991) (evaluating both pre-suit and pretrial delay to find that the government's delay was unjustified and affirming fee award to claimant); *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1163 (2d Cir. 1986). ("Under the *Barker* test, which we think applies to the holding of the forfeiture trial as well as to the filing of the action, there is a due process violation at some point" and observing that "[t]o require prompt filing of a forfeiture action but allow indefinite postponement of the trial would reduce the filing requirement to a nullity."); *United States v. $59,074 in U.S. Currency*, 959 F.Supp. 243, 250-51 (D.N.J. 1997) (applying *Barker* test to both pre-filing and post-filing delay by the government).

Each of the factors weighs in favor of finding that the Government's pretrial delay violates Hope's right to due process:

**1. Length of Delay.** It has been over two years since the Government filed this action. As the Fifth Circuit stated in *$23,407.69*, the deprivation of a "substantial sum of money for a year and a half is undoubtedly a significant burden." 715 F.2d at 166 (citing *$8,850*). Over one year and four months have passed since the entry of the stay. The lengthy and continuing nature of the stay means that despite its age, this case is not remotely close to a resolution – no discovery has occurred. With thirty-six claimants and a list of seized assets that's thirty-six pages long (the result of the Government's choice to frame its Complaint expansively, rather than to group assets obviously related to a single claimant in separate cases), a resolution on the merits is nowhere in sight.

**2. Government's Reasons for Delay.** The Government has never articulated a justified reason for the extraordinary delay in this case. The Government merely invoked 18 U.S.C. § 981(g)(1) and made the generic assertion in a three page motion that it "is conducting an investigation of a criminal matter which is ongoing and directly related to the instant civil forfeiture action. The facts and the parties of the civil case and criminal matter are similar, and, in some instances, identical." Gov. Mot. to Stay, [D.E. 146]. This is a mere recitation of factors the Court must consider to enter a stay, without the assertion of any specific facts to support the required analysis. *Compare* 18 U.S.C. § 981(g)(4) ("In determining whether a criminal case or investigation is 'related' to a civil forfeiture proceeding, the court shall consider the degree of similarity between the parties, witnesses, facts, and circumstances involved in the two proceedings, without requiring an identity with respect to any one or more factors").

Any claim that investigation would be comprised is belied by the 104 page Amended Complaint filed on February 10, 2017, which reads like an indictment and is filled with grandiose allegations of fraud. If the Government's investigation was so sufficiently advanced as to be able to produce this document almost a year ago, it raises the question – what has the Government been doing

since? Any legitimate concerns about not compromising the Government's investigation that could have previously existed are long been satisfied.

**3. Hope's Assertion of Her Rights.** Following the Government's execution of search warrants in this case, Hope retained counsel to assert her rights. She and her related entities filed Verified Claims in order to assert their ownership interests in the assets the Government has restrained. *See* [DE 21] through [DE 24], Verified Claims by Hope Thomley, Thomley Properties LLC, United Business Ventures LLC, and Thomley's Christmas Tree Farm She also moved quickly to oppose a purported claimant who improperly asserted a baseless claim. *See* Hope Thomley's Motion to Join Wade Walter's Motion to Strike Pearl River County Hospital's Claim [DE 194] (Pearl River County Hospital responded by withdrawing its improper "claim"). Moreover, none of the delay in this case has been attributable to Hope. She has never moved for a stay and never moved to extend or continue any deadline.

**4. Prejudice to Hope.** The extensive nature of the seizures and the fact that they have remained unchallengeable to date imperils Hope's right to counsel. While the Government has not charged Hope with any crime, its purported end game is a criminal indictment centered on an alleged healthcare fraud conspiracy. Though the Government is flat out wrong to think ill of Hope, the fact that it has seized almost all of her assets suggests she is at serious risk of being on the wrong end of a wrongminded prosecution. Opposing the kind of allegations the Government seems to have in mind would be a serious fight – and especially given the Government's vast seizure of hardcopy and electronic documents – it would be a time-intensive one.

In *Luis v. United States*, 136 S. Ct. 1083 (2016), the Supreme Court recently addressed the threat that Government pretrial restraints on a person's assets pose to due process and the right to counsel. *Id.* at 1088. (holding "that the pretrial restraint of a criminal defendant's legitimate, untainted assets (those not traceable to a criminal offense) needed to retain counsel of choice

violates the Fifth and Sixth Amendments."). The Court recognized the "fundamental" principle that the "Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Id.* at 1089. The government's "interests in obtaining payment of a criminal forfeiture or restitution order enjoy constitutional protection. Rather, despite their importance, compared to the right to counsel of choice, these interests would seem to lie somewhat further from the heart of a fair, effective criminal justice system." *Id.* at 1093. These principles are relevant to the Court's evaluation of the prejudice that Hope suffers under the current indefinite stay.

The Government's actions have put Hope in a no-win situation. She is threatened by the specter of a potential criminal case. At the same time, the Government has restrained her assets that could be used to defend herself at the investigative stage or if an indictment eventuates. After two years, this case is not remotely close a judgment on the merits. Hope is denied the resources necessary to mount an effective defense. This prejudice is exacerbated by the fact that the Government's seizures and the reputational damage caused by the Government's allegations in this case have functionally destroyed Hope's business.

Standing alone, the pretrial delay rises to the level of a due process violation for which the Amended Complaint should be dismissed with prejudice and Hope's assets released. The lack of due process afforded Hope is made even worse by the government's one-sided use of the stay.

V. **Assets Subject to ERISA's Anti-Alienation Provision and Assets Necessary to Implement Hope Thomley's Right to Counsel Should be Released Immediately**

V(A).  ERISA's Anti-Alienation Provision Protects the Thomleys' Pension Plan Assets from Forfeiture; These Must be Released Immediately

It is clear that the Government has seized and seeks to forfeit pension plan assets protected from forfeiture by ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1). That provision states, "Each pension plan shall provide that benefits provided under the plan may not be assigned

or alienated." The anti-alienation provision has no exception for forfeiture. Hope and Randy Thomley's pension plan comports with ERISA and contains the requisite anti-alienation language. Even if the Court were to assume the veracity of the Government's Amended Complaint, the pension plan assets the Government seized are simply not subject to forfeiture. The Amended Complaint should be dismissed as to these assets and they should be released outright.

ERISA's anti-alienation language results from a "considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done to them." *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376 (1990). There is no "generalized equitable exception – either for employee malfeasance or for criminal misconduct – to ERISA's prohibition on the assignment or alienation of pension benefits." *Id.* (refusing to permit permits imposition of constructive trust on former union official's plan, even though union official had pled guilty to embezzling from union). No exception for forfeitures exists. *See e.g. United States v. Hermann,* 910 F. Supp. 2d 844, 846 (E.D. Va. 2012) ("ERISA's anti-alienation and assignment provision unambiguously prohibits civil or criminal forfeiture of any ERISA plan, including defendant's interest in the [Employee Stock Ownership Plan]."); *United States v. Hargrove*, 2006 WL 2524133 (N.D. Ill. 2006) (applying *Guidry* and concluding pension funds are not subject to forfeiture); *United States v. Jewell*, 538 F. Supp. 2d 1087,1092 (W.D. Ark. 2008) ("The funds in the three retirement accounts are protected from seizure even though the Court must and does accept the grand jury's finding of probable cause on the issue of Jewell's guilt and on the issue of whether the funds are proceeds of the conspiracy to commit mail fraud."); *United States v. Parise*, 1997 WL 431009 (E.D. Pa. July 15, 1997) (pension plan benefits not subject to forfeiture).

The Thomley's pension plan is United Business Ventures, LLC Retirement Plan. **Exhibit 2**, Plan Agreement. The plan contains the ERISA-mandated anti-alienation language:

> 12.2 ALIENATION
>
> (a) **General rule.** Subject to the exceptions provided below, and as otherwise permitted by the Code and the Act, no benefit which shall be payable out of the Trust Fund to any person (including a Participant or the Participant's Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any such person, nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law.

*Id.* at 45.

*United States v. Norton*, 2002 WL 31039138 (W.D. Va. Sept. 9, 2010) (Jones, J.) is on point. There, the district court held that a retirement plan was protected from forfeiture based on an anti-alienation language identical in effect to United Business Venture, LLC's anti-alienation language:

> ASSIGNMENT OR ALIENATION. Subject to Code § 414(p) relating to qualified domestic relations orders, neither a Participant nor a Beneficiary may anticipate, assign or alienate (either at law or in equity) any benefit provided under the Plan, and the Trustee will not recognize any such anticipation, assignment or alienation. Furthermore, a benefit under the Plan is not subject to attachment, garnishment, levy, execution or other legal or equitable process.

*Id.* at *2.

The statute and the case law are clear. The assets the Government designates as A-097 and A-098 are protected by ERISA's anti-alienation provision and cannot be subject to forfeiture. Accordingly the Amended Complaint must be dismissed as to the following assets, which should be immediately released:

| | | |
|---|---|---|
| A-097 | $547,683.93 seized from Brinker x9499, an account in the name of UBV, LLC Retirement Plan, with authorized signer Hope E. Thomley. | S.D. NY |
| A-098 | $796,876.48 seized from Brinker x09431, an account in the name of UBV, LLC Retirement Plan, with authorized signer Howard "Randy" Thomley. | S.D. NY |

Attachment A to Amended Complaint, [D.E. 183-1] at 7; *see also* Amended Complaint [D.E. 183] at ¶¶265-66.

### (V)(B). In Addition, the Court Should Release Assets Sufficient to Implement Hope Thomley's Right to Counsel

The due process violation discussed in Section IV requires dismissal with prejudice of the Amended Complaint and immediate release of all the subject property as to Hope. If the Court nonetheless finds something short of a due process violation, the immediate release of sufficient funds are critical to implement Ms. Thomley's Right to Counsel. As discussed above in the context of the prejudice suffered by Hope as per the *Barker* factors, maintaining the status quo eviscerates Hope's right to counsel. The Government's *ex parte* seizures have handicapped her ability to meet the threatened allegations head-on and jeopardize her constitutional rights.

In light of the apparent number of defendants based on the allegations as the Government conceives them (including as demonstrated by the 104 page Amended Complaint it has filed), the presumptive length of a criminal trial if the Government proceeds to an indictment, the sophistication of the issues involved, the need for investigative work and expert testimony, and the huge quantity of hardcopy and electronic documents at issue, $3 million of Hope's assets should be released in order to fund her defense.

### VI. Conclusion

Enough is enough. The Government has had two years from the institution of this action to bring its criminal investigation to a conclusion, or to move this case to one. It has done neither, all

while paralyzing Ms. Thomley's assets. Having not fished, the Government must be required to cut bait. The Court should lift the stay, dismiss this case with prejudice as to Hope's assets for the Government's violation of her right to due process, and order her assets released. In the alternative, the Court should lift the stay and release those funds necessary to implement Hope's right to counsel and those funds protected by ERISA's anti-alienation provision.

Respectfully submitted,

| By: s/ Paul A. Calli<br>Paul A. Calli<br>Florida Bar No. 994121<br>Charles P. Short<br>Florida Bar No. 70633<br>pcalli@calli-law.com<br>cshort@calli-law.com<br>cbussone@calli-law.com<br>*Co-counsel for Hope Thomley*<br>CALLI LAW, LLC<br>One Flagler Building<br>14 Northeast 1st Avenue, Suite 1100<br>Miami, FL  33132<br>Telephone: (786) 504-0911<br>Facsimile: (786) 504-0912<br>*Admitted Pro Hac Vice* | By: s/ T. Michael Reed<br>T. Michael Reed<br>Mississippi Bar No. 99229<br>michael@tmichaelreed.com<br>*Counsel for Hope Thomley*<br>T. MICHAEL REED, P.A.<br>612 N. Main Street<br>Hattiesburg, MS  39403<br>Telephone: (601) 583-2607<br>Facsimile: (601) 583-2641 |

CASE NO.: 16-CV-27- TSL-RHW

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 8, 2018, I electronically filed the foregoing document with the Clerk of Court using CM/ECF and that the foregoing document is being served this day on all counsel of record.


By:  s/ Paul A. Calli